ESTATE OF EANNELLI (Anna): VENCI, Administratrix, Appellant, vs. EANNELLI, Administrator, and others, Respondents.*

*February 9—March 8, 1955.*

* Motion for rehearing denied, with $25 costs, on May 3, 1955.

194

196

198

200

201

For the appellant there were briefs by *Vaughn S. Conway,* and oral argument by *Vaughn S. Conway* and *Kenneth H. Conway,* both of Baraboo.

For the respondents there were briefs by *Niebler & Herro,* attorneys, and *Chester J. Niebler* of counsel, all of Milwaukee, and oral argument by *Chester J. Niebler,* and *Marshall J. Herro,* and by *M. J. Paul* of Berlin.

STEINLE, J. Our first consideration in the matter of these appeals is appellant's challenge of the trial court's findings of fact. It is well established in this jurisdiction that findings of a trial court are not to be disturbed on appeal unless they are contrary to the great weight and clear preponderance of the evidence. *Swazee v. Lee* (1951), 259 Wis. 136, 137, 47 N. W. (2d) 733.

Upon the trial, the respondents (petitioners below) presented evidence to the effect that Anthony Eannelli had survived the others. The appellant (respondents below) offered evidence that Anna Eannelli was still living after the three other members of the family had died. The trial court determined: (1) That there is no sufficient proof that Anna Eannelli and her husband, Massemino Eannelli, and their son, George Eannelli, died otherwise than simultaneously, and (2) that Anthony Eannelli survived his parents and his brother, and was their only heir at law and nearest of kin. In order to determine whether the trial court's findings of fact with reference to survivorship are contrary to the great weight and clear preponderance of the evidence, as contended by appellant, it is necessary to review the evidence presented upon this subject, particularly as to material statements of witnesses who testified in relation thereto.

Merritt Tucker, bus mechanic residing at Benton Harbor, Michigan, called as a witness by petitioners, testified amongst

other matters, that while driving a truck behind the Eannelli car which previously had passed him on the road, he observed (from a distance of about 500 to 1,000 feet) the collision between the Eannelli automobile and the train. He stated that the automobile ran directly into the side of the train, spun counterclockwise across the highway, moved into a ditch, but stayed upright. Upon arriving at the site where the automobile had come to a stop, he observed that the motor of the car was torn out, and the right side of the car was torn back. He "looked at the mother first and she was gone." He stated that "from her condition, from the looks of her, she was dead." He "could see no sign of life." She was lying in the back of the car with her head upon the back shelf. The top of the car was crushed onto the top of her head. The witness observed the front of her body as he stood at the side of the car and saw her head when looking through the rear window.

Tucker stated that he next observed a man lying outside the car on the driver's side. He took hold of the man's wrist to see if there was any pulse, but couldn't find any sign of life. He testified as to his training in first aid while in the military service and his ability to "take a pulse." He next saw the boys lying under the back of the car, one obviously was dead. The other (Anthony) was still alive, gasping, breathing, and moving. This boy was "lying on his stomach, and his head was moving up and down, and he was gasping. He was under the right rear of the car." That boy (Anthony) was the last one to die.

Lewis J. Kurz of Peru, Indiana, fireman of the train involved in the collision, was called as a witness by respondents. He testified that after the collision he got off the train before it stopped a short distance from the highway and proceeded to the automobile. He observed a woman in the back seat and felt her pulse. There was no pulse beat and she "apparently was dead." A man (the father) lay underneath the

car on the ground. The witness felt his pulse but there was no beat. "He apparently was dead." The boys were under the car. The witness looked at the older boy (Anthony) who was bleeding from the mouth and ears and took his pulse, but there was no pulse beat. The smaller boy (George) was groaning and he had a faint pulse beat. When this boy was removed from underneath the car the pulse beat stopped within a few seconds.

Respondents at the trial presented as evidence death certificates of each member of the Eannelli family. These certificates are discussed later in this opinion.

Upon the trial the appellant presented three Indiana state police officers as witnesses, Jacob Dwight Nash, Virgil Perratta, and James A. McKee, each of whom gave testimony concerning events upon their arrival at the scene of the accident shortly after its occurrence. Nash was the last of the three to reach the scene. He testified that the entire right side of the car was torn away. A woman was in the back seat in a sitting position. He noticed that she was pinned into the car. He was solicitous about keeping her in that position until the ambulance arrived. He assisted in the attempt to get the bodies out from under the car. He saw the body of the man lying on the ground to the left of the rear of the car.

Perratta testified that he and McKee arrived at about the same time. After glancing momentarily at the woman in the back of the car he walked around the car and saw the body of a man on the ground a couple of feet to the rear and slightly to the side of the car. He felt the pulse of the man. There were no signs of life, he believes that McKee checked the pulse of the man briefly. Thereafter he saw the bodies of the boys under the rear part of the car. When the wrecker arrived it lifted the car with chains and a hoist and the witness crawled under the car and pulled out the boys. When he brought the first boy out he felt the pulse, but could find

no sign of life. The witness believed that the second boy was dead when he was removed from under the car. There was no sign of life at all.

When cross-examined, Perratta testified that as he looked at the woman "at the time he thought her head was bashed in . . . he glanced at her as he went by . . . he saw what appeared to be a mass of blood and perhaps brains on the back of her head. Her head was laying in what he thought was blood. . . . I thought her head was badly crushed, but later I found I was wrong." He also stated "I don't know if there was any blood on the woman."

Introduced in evidence was a written statement in form of an affidavit signed August 1, 1951, by the witness, Virgil Perratta. Therein it was stated that Perratta—

". . . upon looking into the car he found the body of Anna Eannelli, the wife, and that said Anna Eannelli was dead; that the skull and head of said Anna Eannelli was severely crushed and that it was obvious to him that said Anna Eannelli was dead; that affiant saw Massemino Eannelli lying on the ground near the car and feeling that said Massemino might still be living, this affiant and a truck driver moved the body of Massemino away from the scene of the wreck; that affiant tried to take the pulse of said Massemino and that affiant had the pulse of said Massemino taken by another person.

"Affiant further states that it could very well be that Massemino was still alive upon the arrival of this affiant at the scene of the accident and affiant states that Anna Eannelli was obviously dead upon his arrival."

Admitted into evidence was another affidavit of Perratta, this dated October 17, 1952, in which all of the statements of affidavit of August 1, 1951, were affirmed and in which the witness stated:

"Affiant further says that he was the first police officer to arrive at the scene of the accident in which the Eannelli family sustained fatal injuries; that after moving the body

of Massemino farther away from the wreck as stated in that affidavit above referred to he proceeded to check on the condition of the two young men, George and Anthony Eannelli; that the automobile was supported on one side by a concrete retaining wall about 18 inches in height and which it had come to rest; that the bodies of the two young men were under the automobile in the aperture formed by the automobile and the retaining wall; that the weight of the automobile was not resting on the body of either one; that the legs of the two young men were intertwined; that in order to remove them from under the wreck it was necessary to move their bodies around; that while so doing your affiant distinctly heard a gurgling sound emit from the throat of one of them; that some time later when the bodies of both young men had been removed from under the wreck your affiant found no further signs of life. Affiant further states that both young men had bled, that one had bled profusely; that the body of the man Massemino Eannelli also showed signs of having bled; that to the best of your affiant's recollection there were no signs of blood on the body of the wife, Anna Eannelli."

Perratta also testified that subsequent to the time of the accident McKee told Perratta that Perratta was mistaken with reference to what he had seen regarding Mrs. Eannelli's condition.

James A. McKee of Michigan City, Indiana, a salesman for a trailer company, testified that he had been a state trooper with the Indiana state police for eleven years until April 1, 1952. His training with reference to first-aid assistance, etc., was similar to that of the other officers who had testified. He was the officer in charge of the investigation of the accident in question. Upon arrival, he observed a woman in the back seat of the automobile. The body was visible to the rear and side of the car. He was informed by spectators that there were bodies beneath the car. He checked the woman momentarily and then proceeded to the place where Officer Perratta was taking the pulse of the man lying

on the ground near the side of the car. McKee stated that he too checked the man for pulse, but was unable to detect any whatever. He believed the man to be dead. He returned to attend the woman and instructed Perratta to take care of the men under the car. He made a thorough examination of the woman. He endeavored to determine whether the top of the car was down tight against her body. He tried to ascertain whether there was any serious bleeding. There was none. He instructed Officer Nash to try to raise the top of the car so that the condition could be made more visible. The woman was moaning, distinctly. He checked the pulse in her right wrist and there was a definite pulse. After the boys were removed from underneath the automobile, Officer Perratta and the witness checked them. The eyes of one boy were wide open, the pupils were dilated, there was no pulse. When checking the other boy the witness found no pulse. He returned to care for the woman until the ambulance arrived. She was alive up until the time the ambulance came. As the woman's body was placed upon the stretcher there definitely was movement of her left foot. The woman's head was not crushed. A considerable amount of strawberries had rested on the ledge behind the rear seat. In the crash the berries had been smashed and became entangled with her hair and across her face and neck.

During cross-examination Officer McKee testified that the coroner arrived at the scene of the accident and McKee spoke to the coroner briefly. McKee filed an accident report with his superiors. It indicated that Anna Eannelli had sustained skull fracture, broken neck, and internal injuries. McKee testified that he obtained such information from the undertaker. He said that he did not see any of the bodies after they were placed in the ambulance, except at the funeral home where he had gone following his departure from the scene of the accident. It was after he had been at the funeral

home that he completed his report. McKee said that the first time he told about the survival of Anna Eannelli was the first time that he was asked. He could not fix the time. McKee said that sometime after the accident he told the story, as related upon the witness stand, to Officer Perratta. He told it to Attorney Conway in the early part of 1952. He talked to Attorney Conway more than once before the trial.

Also called as a witness for appellant was Richard Strasser, a steel hauler, residing at Winnemac, Indiana. He testified that Officer Perratta was already at the scene when the witness arrived. He assisted Perratta in pulling the man's body farther away from the place where it lay near the rear of the car in order to have room to extract the bodies from underneath the car. After the boys' bodies were pulled out, Perratta asked the witness to feel the pulse of the second boy removed from underneath the car. Perratta had felt the wrist of this boy and told the witness that he could find no pulse. The witness was not able to find a pulse upon this boy. He did not see sign of life in any of the three men.

When cross-examined, Strasser stated that upon arrival he first saw a woman in a reclining position in the car. It seemed as though part of the car was resting below her head. It appeared that she was dead. He could neither deny nor confirm that he had told a person who called him from Berlin, Wisconsin, that he had thought that Massemino had a slight pulse. The witness stated that he assisted in removing the body of the wife from the car.

In redirect examination Strasser testified to the presence of strawberries on the back ledge of the car and that strawberries were in the woman's hair and around her face and body. He made no examination to see if her head was crushed.

Dr. Raymond Dreyer of Poynette, testifying on behalf of the appellant, stated that a person with training should be better qualified to take a pulse than an untrained person;

that nobody could tell simply by looking at an accident victim whether he was dead; that moaning is a sign of life, and that a person may be alive although suffering from a broken neck.

The weight of this evidence and the credibility thereof were matters entirely within the province of the court as the trier of the facts. It was the duty of the court to give the testimony of the witnesses its proper and legitimate weight and importance. The evidence is in conflict. The court was obliged to resolve the conflict. It was for the court to determine which witnesses to believe and which inferences to draw. The court had an opportunity at the trial to observe the appearance and demeanor of the witnesses on the stand and their manner of testifying. Their credibility was for the court to decide.

Counsel for appellant contends that the testimony of the witness McKee was positive as to the death of the persons involved, whereas that of the other witnesses was negative on that subject. It is appellant's position that the rule "where one witness testifies positively and another negatively as to the existence of a fact, the positive testimony is entitled to greater weight," is applicable here. The testimony, for instance, of the witness Tucker, when he was discussing his observation of Anna Eannelli,—"from her condition, from the looks of her she was dead. I could see no sign of life,"— is not negative testimony. Testimony is negative only when it tends to prove the nonexistence of a fact by reason of a failure of a witness to observe and remember its existence. *Coel v. Green Bay Traction Co.* (1911), 147 Wis. 229, 133 N. W. 23. Tucker's testimony with reference to the death of Anna Eannelli is based upon his observation of her at the time of the accident and his recollection thereof. The ability of Tucker, as well as that of the other witnesses, to determine whether the death of any of the persons involved, existed, were items for the court to consider and decide.

At the trial, respondents offered in evidence death certificates of the Indiana state board of health pertaining to each

of the members of the Eannelli family involved in the accident. Four are designated "Coroner's Certificate of Death" and four bear a heading "Certificate of Death." Besides recital of name, residence, age, sex, marital status, and occupation of the persons referred to therein, are such as place, time, and manner of death, and conditions leading directly to death. Those designated as "Coroner's Certificate of Death" purportedly bear the signature of the coroner and the health officer of the county where the accident took place, and are on forms of division of vital records of Indiana state board of health. They are certified by the state health commissioner of Indiana, bear the seal of the state board of health of Indiana, and are authenticated by the secretary of state of Indiana. The others contain the names of local officers and bear the seal of the Indiana state board of health. They too, purportedly, are on forms of division of vital records, Indiana state board of health.

It is appellant's position that there was prejudicial error in the admission of the death certificates. Appellant at the trial had objected to their admission, (1) for the reason that they were not properly authenticated, and (2) on the ground that they contained hearsay evidence concerning which the person or persons who prepared them could not competently testify at the trial.

We find no merit in appellant's first point of objection. Under provision of sec. 327.18, Stats., a certified copy of a certificate of this nature issued by a proper official of this state or of the United States is admissible in evidence. Authentication of such record is required only when issued in a foreign country. Sec. 328.09 (3). Here, the certificates bearing designation "Coroner's Certificate of Death" were authenticated by the secretary of state of Indiana.

In relation to appellant's second objection, two statutes apply. Sec. 327.18 (1), Stats., provides in part:

"Official Records. (1) *As evidence.* Every official record, report, or certificate made by any public officer, pursuant to law, is evidence of the facts which are therein stated and which are required or permitted to be by such officer recorded, reported, or certified, . . ."

Sec. 328.09 (1), Stats., provides in part:

"*Records as evidence.* The record of any . . . death kept in the office of . . . state bureau of vital statistics shall be received as presumptive evidence of the . . . death so recorded."

Death certificates are within the category of the well-established exceptions of the hearsay rule. They are *prima facie* evidence of the facts stated therein, although such facts are subject to rebuttal. Information contained therein based upon hearsay evidence, is admissible. It may, however, be rebutted. *Milwaukee E. R. & L. Co. v. Industrial Comm.* (1936), 222 Wis. 111, 116, 267 N. W. 62; 5 Wigmore, Evidence (3d ed.), p. 560, sec. 1642 *et seq.*; 2 Jones, Evidence, Civil Cases (4th ed.), p. 981, sec. 511. However, conclusions stated in official records are not admissible. *Jacobson v. Bryan* (1944), 244 Wis. 359, 12 N. W. (2d) 789.

Appellant complains principally with respect to the information appearing in the death certificates that Anthony Eannelli died at 5:05 p. m., while the others died at 5 p. m.

Had the coroner appeared as a witness at the trial, and had it been established that his information concerning the time of death of the Eannellis was based only upon hearsay evidence, his testimony in such regard would have been incompetent. As result of such showing, the information concerning the time of death as stated in the certificates would clearly have depreciated in weight. Counsel for appellant offered in evidence a certified photostatic Certificate of Death of the coroner which indicated that Anna Eannelli died at 5:10 p. m. This certificate appears upon form identi-

cal with that offered by respondents concerning the death of Anna Eannelli and which was received in evidence. There is a difference in these copies in that the time of death is handwritten in the copy presented by respondents, while it is typewritten in the copy offered by the appellant. The trial court construed the time referred to in respondents' copy as 5 p. m. We cannot say that such determination is contrary to the writing appearing in that copy. It appears that objection to appellant's copy was based upon a contention that it was detached from a group of certified "Coroner's Death Certificates" which included those pertaining to the other Eannellis. It was not received in evidence. However, it was admissible and ought to have been received. Respondents could well have arranged to present duplicates of the copies which had been detached, had such been their pleasure. Upon the record it does not appear that had the excluded exhibit been admitted, the result in the findings would have been changed. For this reason we cannot hold that the error in rejecting the exhibit, was prejudicial. Exclusive of any consideration of the death certificates, there is adequate competent evidence in the record to support the trial court's findings. In nowise does it appear that the findings are against the clear preponderance or great weight of the credible evidence. Findings may not be disturbed on appeal where they are supported by the evidence.

Proceeding to a consideration of the appeal herein in relation to the order of the court denying the motion for a new trial on the grounds of newly discovered evidence and in the interest of justice, it is to be observed, that the granting of a new trial on either ground rests within the discretion of the court.

"The granting of a new trial on the ground of newly discovered evidence rests within the sound discretion of the trial court and its determination will not be set aside unless it is shown to be a clear abuse of such discretion." *Estate of Teasdale* (1953), 264 Wis. 1, 7, 58 N. W. (2d) 404.

"The granting of a new trial in the interest of justice is discretionary and a court's order therefor will not be disturbed except for abuse of discretion. . . . *Myhre v. Hessey* (1943), 242 Wis. 638, 641, 9 N. W. (2d) 106.

The requirements that must be met before a new trial will be granted on the ground of newly discovered evidence were set forth in *Estate of Teasdale, supra* (p. 4). They are:

(1) The evidence must have come to the knowledge of the party after the trial.

(2) The party must not have been negligent in seeking to discover it.

(3) The evidence must be material to the issue.

(4) The evidence must not be merely cumulative to testimony discovered at the trial.

(5) It must be reasonably probable that a different result will be reached on a new trial.

Concerning that part of the alleged newly discovered evidence relating to the finding of other witnesses who were present at the scene after the accident, there is no dispute that such information did not come to the knowledge of the appellant until after the trial. With respect to the written order of which appellant complains he had no notice, and the letters written by Attorney Niebler to the court, we find nothing of record to indicate that these were not at all times after their delivery, in the public files of the court.

In its written decision respecting this motion the trial court commented upon the failure of the appellant to inform the court as to her efforts to discover all of the material evidence before the time of the hearings and the trial. Attorney Vaughn Conway presented an affidavit regarding his activities on appellant's behalf. He stated that he "interviewed reporters, read newspaper accounts, checked records and reports, interviewed policemen, state troopers, endeavoring to locate witnesses, etc." Respondents counter that this is not specific statement of activity,—that it is necessary that

there be showing of what was specifically done in the effort to discover the evidence. They point to pictures in evidence showing a considerable number of persons at the scene of the accident whose testimony may have been made available before trial,—also to the fact that several of the witnesses, now offered, declared in their affidavits that they assisted troopers who testified at the trial. They contend that it does not appear that the evidence could not have been brought out at the trial by a reasonable effort.

General averments as to diligence are not sufficient. The facts should be set out so as to negative fault on the part of the movant. 39 Am. Jur., New Trial, p. 191, sec. 190.

Applications for a new trial on this ground are looked upon with suspicion and disfavor, the presumption being that the failure to discover such evidence is due " 'either to intentional omission, or unpardonable neglect' " of the moving party. In order to rebut this presumption, " 'His excuse must be so broad as to dissipate all surmises to the contrary.' " *Estate of Teasdale, supra* (p. 4), citing *Edmister v. Garrison* (1864), 18 Wis. *594, *603, *604; also *Mickoleski v. Becker* (1948), 252 Wis. 307, 31 N. W. (2d) 508. Considering the rule and the affidavits presented, we are not able to hold that the trial court abused its discretion in determining that there was not a sufficient showing of diligence.

That the statements in the affidavits of those who now indicate that they were present after the accident are material to this issue is not contradicted. However, respondents maintain that such statements would merely be cumulative. While the court did not refer to this item in its decision, it appears that the evidence offered is cumulative as to material particulars. Bearing in mind the evidence presented at the trial and the court's analysis of it, and considering the affidavits of the persons who now assert their presence at the scene after the collision, we are unable to rule that the new evidence would with reasonable certainty produce a different result.

We are not able to find in this record any manifestation whatsoever that the trial judge was improperly influenced by any act of the counsel in rendering a fair and impartial decision with respect to the matters in controversy. There is no indication that the court overlooked any of the evidence or that it failed to give proper weight or attach proper credibility to the testimony of the witnesses, or that it disregarded any argument of counsel. In its decisions the court indicated the reasons for its action. It demonstrated a full understanding of the case. There is no evidence of arbitrary conclusion on its part. The record indicates that the court was courteous to counsel and did not favor either side. No one can read this record without sensing the spirit of personal hostility between two of the opposing counsel throughout practically all of the proceedings. Despite the tension engendered by such attitude, coupled with the strain attendant upon the presentation and consideration of matters in the cause which were of great consequence to both sides, it appears that the trial judge exercised a high degree of patience and obviously concerned himself only with a desire and effort to reach proper and just decisions upon the matters at issue.

Members of the legal profession ought ever to observe that Canon of Ethics (Professional Canon 17) which provides:

"Clients, not lawyers, are the litigants. Whatever may be the ill-feeling existing between clients, it should not be allowed to influence counsel in their conduct and demeanor to each other or toward suitors in the case. All personalities between counsel should be scrupulously avoided."

The action of Attorney Niebler in sending communications to the court without making the same known to opposing counsel, was improper. Whatever the reason,—and he seems to assign his exasperation over the failure of opposing counsel to comply with matters of form and procedure as the cause,—

the practice cannot be condoned. Another Canon of Ethics (Judicial Canon 17) of the profession provides that:

"Ordinarily all communications of counsel to the judge intended or calculated to influence action should be made known to opposing counsel."

While it is recognized that in probate matters, items of procedure are frequently discussed informally by counsel and court, yet even as to such affairs, when they pertain to controversial matters, and although they concern only questions of form or procedure, counsel on both sides ought to be advised as to any discussion or communication had with the court regarding them. In the present situation it appears from the record that counsel on both sides individually discussed matters with the court outside the presence of the other. There is no indication that such matters were designed to influence the court in the performance of its duty, or that they in fact influenced the court in arriving at its decision. Scrutiny of the letters sent by Attorney Niebler leads to the same conclusion.

Courts are continuously confronted with situations where their decisions subject them to criticism by those adversely affected. Bench and bar must ever be on guard to do or permit nothing to arouse in the minds of litigants any thought or suspicion that they may not be receiving even-handed and impartial justice.

Upon the entire record we are obliged to conclude that the findings of fact upon which the judgment is based, are not contrary to the great weight and clear preponderance of the evidence, and that the trial court did not abuse its discretion in denying the motion for a new trial either upon the ground of newly discovered evidence or in the interest of justice.

*By the Court.*—Judgment and order affirmed.