Jack Palmer GLOVER et al., Appellant,

v.

Ward DAVIS et al., Appellee.

No. 7170.

Court of Civil Appeals of Texas.

Amarillo.

Sept. 17, 1962.

Rehearing Denied Oct. 22, 1962.

Underwood, Wilson, Sutton, Heare & Berry, Amarillo, for appellants.

Frank D. McCown; C. D. Bourne, Jr., Dumas, for appellees.

CHAPMAN, Justice.

This case was instituted by Aetna Life Insurance Company as an interpleader to determine which of two groups of claimants were entitled to the proceeds of two insurance policies on the life of Weldon Merton Glover, Jr.

On April 8, 1960, the insured; his wife, Ann Glover; their two only children, Brenda Kay Glover and Betty Lou Glover; together with two passengers named Hammer and Sledge were all killed in an automobile collision on North Dumas Avenue immediately north of or in the city of Dumas. Mr. Glover had policies of insurance listing his wife as beneficiary if she survived him, but if she did not survive him then his children, or the survivor of them. The policies provided if none of them survived him, his parents or the survivor of them would be the beneficiaries or beneficiary.

It was stipulated that Weldon Merton Glover, Jr.'s mother; wife, Ann; and daughter, Brenda Kay, did not survive him but that his father, W. M. Glover, Sr. did survive him. It was also stipulated that the only question for termination by the court was whether the older and larger of the two girls, Betty Lou Glover, survived her father.

Upon a trial to the court, following the testimony of three witnesses, judgment was rendered that Betty Lou Glover survived her father. Appeal is perfected from that judgment, and the case is before us without findings of fact or conclusions of law or any requests therefor.

T. A. Cariker, a filling station attendant at what is known as 287 Truck Stop on the west side of Dumas Avenue, was inside the station at about midnight when he heard a crash outside that sounded like an automobile collision. He testified: "Well, I raised up and looked out and there was nobody moving and then finally I walked outside."

When he went outside and passed a truck parked facing south just off the pavement, he saw an automobile also facing south that looked as if it had "went under the truck and bounced back out a little." He shined his flashlight in the front seat through the driver's window and saw a woman in the driver's seat and two men. He " * * * didn't see a bit of sign of life in the front seat." He further testified:

"Q. Did you hear them breathe?

"A. No, sir.

"Q. Did you see anything that indicated to you that they were alive?

"A. Not one thing.

"Q. Did they appear to be dead to you?

"A. I thought they were."

It was stipulated that Ann Glover was the woman under the steering wheel and her husband was sitting next to her.

The witness after concluding the three in the front seat were dead shined his light in the back seat and discovered a man and a little girl down on the floorboard and the older of the two Glover children, Betty Lou, "laying up in the seat." With respect to the child lying in the seat, he testified:

"Q. Did you see any sign of life coming from the little girl that was laying up in the seat?

"A. Yes, sir. She was gasping pretty hard for breath.

"Q. Could you see that occurring?

"A. Yes, sir.

"Q. Would you describe that to the judge?

"A. Well, I thought she was dying then. She was gasping for breath. You could see her whole chest move.

"Q. You said you thought she was dying and you said something after that.

"A. I could hear her gasping and I could see her mouth work when she was trying to breathe.

"Q. Could you hear anything coming from this girl?

"A. Yes, sir.

"Q. Would you describe what you could hear, please?

"A. Well, just like someone that was having a hard time breathing."

The record shows someone from the cafe then called Mr. Morrison of Boxwell Funeral Home and that Mr. Cariker went back to the car when Mr. Morrison was removing the bodies.

With respect to Weldon Merton Glover, Jr., Mr. Cariker further testified:

"Q. How about the man who was next to her on her right?

"A. As far as I could tell he was dead; there was never a movement."

On cross examination the witness testified as follows:

"Q. Do you think there is any possibility that you could be mistaken in your conclusion?

"A. About what?

"Q. As to whether or not the little girl was alive or dead at the time.

"A. No, I was not mistaken about her breathing."

The next witness for the appellees was Mr. Morrison, manager and funeral director for 18 years, though not a mortician, for Boxwell Brothers Funeral Home in Dumas. He had been in bed asleep when the Police Department called him following the collision. He dressed and drove the ambulance 15 or 16 blocks to the scene of the tragedy, pulled the ambulance around to the back of the car involved in the collision and started moving the bodies from the car. He first moved Brenda Kay in order to be able to better handle Betty Lou. He then removed her "because she showed signs of life."

"Q. What were those signs of life?

"A. She was breathing and gasping.

"Q. Now, at that point could you hear her breathing or is this something that you just saw?

"A. I heard her.

"Q. Holding her there, could you hear her breathing?

"A. Yes, sir."

He then testified that about the time he put her on the ambulance cot she failed to breathe any more that he could detect.

With respect to the insured he testified that while removing the two girls from the back seat, he didn't see anything or notice anything that indicated * * * any sign of life from either Mr. or Mrs. Glover.

Appellants called only one witness, Dr. O. J. Richardson, who did not see Betty Lou until they brought her to the hospital. He testified she was dead at the time he saw her and also testified:

"Ordinarily, we look at their eyes. Their eyes are fixed and immobile and no reaction to light. We usually check their heartbeat with a stethoscope and listen to the lungs."

He testified he considered those are the minimum requirements for determining whether a person is dead or alive and that:

"We also check the pulse to see if the pulse is beating. If there is no pulse, no heartbeat, we consider them dead."

On cross examination he admitted:

"We usually don't pronounce them dead until all breathing ceases."

He also said in his opinion all occupants of the car were killed instantly and that Betty Lou, in his opinion, could not have lived one minute after the collision. However, he admitted no respiration is audible after death. His testimony further shows:

"Q. If you had been physically present it would have been a pretty hard job to tell which one was the last one to take a breath?

"A. It's hard for one man to see all personally and it was in the dark and a lot of fumes around.

"Q. If you had been there and one of them was breathing, would you have considered there would still be some life in that person?

"A. I would have tried to revive that person and helped that person.

"Q. Why?

"A. First thing I would do is examine the person to see how serious the injuries were.

"Q. If that condition kept up ten or fifteen minutes and without any close examination with a stethoscope or laying your ear on the body, you could hear her two or three feet off breathing, you'd know right then that she had some life in her, would you not?

"A. Yes, sir. I would give her first aid.

"Q. Even though a quite cursory examination of the wounds, not even a close examination, but just seeing they were fatal and there was one still breathing, that would be the one to receive your first attention, would it not?

"A. Yes, sir.

"Q. Is it your testimony to the Court that Betty Lou Glover was dead instantly at the time she received those injuries together with her father, Weldon Merton Glover?

"A. With the rest of the family. I think they were all killed instantly. I doubt if any of them knew what happened to them.

"Q. It could be possible that one of them could have lived a few minutes longer than the other.

"A. I'm sure that each one of them died at a separate time.

"Q. Some of them could have been close together.

"A. Death was instantaneous. Their injuries were so severe that they could not have survived.

"Q. That's right. But if one of them was breathing ten or fifteen minutes after the impact, would that person, in your opinion, survive after the others?

"A. I couldn't pronounce her dead until she quit breathing."

In 1940 the National Conference of Commissioners on Uniform State Laws and the American Bar Association approved the Uniform Simultaneous Death Act. The portion pertaining particularly to the instant case is Section 5 and reads as follows:

"Where the insured and the beneficiary in a policy of life or accident insurance have died and *there is no sufficient evidence* that they have died otherwise than simultaneously the proceeds of the policy shall be distributed as if the insured had survived the beneficiary, * * *"

All emphases herein are ours.

In 1951 Texas first enacted legislation patterned after the above mentioned act. Acts 1951, 52 Leg., page 322, Ch. 196. That legislation is now Section 47, Probate Code,

V.A.T.S. and Subsection (e) thereof pertaining to this case reads as follows:

"When the insured and the beneficiary in a policy of life or accident insurance have died and *there is no direct evidence* that they have died otherwise than simultaneously, the proceeds of the policy shall be distributed as if the insured had survived the beneficiary."

It should be noted that Section 5 of the Uniform Simultaneous Death Act uses the terms:

"Where the insured and the beneficiary in a policy of life or accident insurance have died and *there is no sufficient evidence* * * *"

While the Subsection of the Texas Act corresponding thereto reads:

"When the insured and the beneficiary in a policy of life or accident insurance have died and there is no *direct evidence* * * *."

Appellants contend the use of the term "no direct evidence" places a much greater burden on those seeking to prove the insured and beneficiary died otherwise than simultaneously than does the Uniform Act adopted by many of the states, which uses the term "no sufficient evidence."

■ We believe and so hold that the use of the term "direct evidence" by our legislature in this instance was simply intended as the converse of circumstantial evidence with the terms used in their general sense.

■ Our Supreme Court has plainly distinguished between the two wherein they quoted with approval from a textual statement as follows:

" 'Direct evidence is proof of the facts by witnesses who saw the acts done or heard the words spoken, while circumstantial evidence is the proof of collateral facts and circumstances from which the mind arrives at the conclu-

sion that the main facts sought to be established in fact existed.' " Texas & N. O. R. Co. v. Warden, 125 Tex. 193, 78 S.W.2d 164, 167 (Com.App. Opinion Adopted)

■ We have found no later authority wherein our Supreme Court has changed or altered the above definition distinguishing direct evidence from circumstantial evidence in civil cases and must, therefore, conclude it is still a proper rule in our state to follow. It seems reasonable to say that if all parties in a collision case are unquestionably dead before anyone arrives at the scene or observes any of them alive, it would be necessary to rely on circumstantial evidence in order to prove survivorship and therefore they would have to be considered to have died simultaneously under Subsection (e) above. Such is not the situation in our case because we have two witnesses testifying positively that Betty Lou ·was still breathing at a time that we believe the trial court could have found the evidence showed was at least 10 to 15 minutes after the collision. There is also some direct testimony from which the trial court could have concluded the insured died instantly—at the immediate time of the collision. The question we must determine then is whether the lay witnesses, Cariker and Morrison, were competent to testify under the circumstances of this case to life and death and if the testimony was sufficient to negate simultaneous deaths of the insured and beneficiary.

The Wisconsin Supreme Court in a case where the parents and two sons perished in a collision between their car and a train upheld a judgment based upon testimony by lay witnesses. The case was tried to the court as here. The witness, Tucker, testified:

"He 'looked at the mother first and she was gone.' He stated that 'from her condition, from the looks of her she was dead. He could see no sign of life.' "

He then examined the father by feeling his pulse and testified to training in first aid in the Army. He next observed the boys lying under the back of the car and testified, "One was obviously dead. The other (Anthony) was still alive, gasping, breathing and moving." He concluded Anthony survived the others.

The witness, McKee, another layman who testified, concluded the mother survived. He gave proof of being a former state trooper and trained in first aid. The court said:

"The ability of Tucker, as well as that of the other witnesses, to determine whether the death of any of the persons involved, existed, were items for the court to consider and decide." In re Estate of Eannelli (Venci v. Eannelli), 269 Wis. 192, 68 N.W. 791.

Another similar case has been decided by the Supreme Court of Idaho in which the testimony of lay witnesses were upheld and in which the two victims were shown to have died in 15 minutes of each other. That court said:

"It having been concluded by the trial court *on competent*, though conflicting, evidence that Mary Davenport survived her husband James Davenport by 15 minutes, she succeeded to the estate * * *" In re Davenport's Estates, 79 Idaho 548, 323 P.2d 611.

Though it involved a will instead of insurance policies, our Supreme Court in White v. Taylor, 155 Tex. 392, 286 S.W.2d 925, gives us some guides to follow. The court in construing the Uniform Simultaneous Death Act or sections of the Probate Code said:

"The cases in other jurisdictions * * * uniformly hold that if there is any evidence of probative force that either party survived the other, even when the deaths occur at approximately the same time, the statute is inapplicable and the question of survivorship requires no higher degree of proof than any other fact."

The court then cited a number of cases from other jurisdictions. In one of those cases, Sauers v. Stolz, 121 Colo. 456, 218 P.2d 741 the Supreme Court of Colorado construed Section 1 of their Statutory Simultaneous Death Act Laws 1943, c. 197 which says:

"Where the title to property or the devolution thereof depends on priority of death and *there is no sufficient evidence* that the persons have died otherwise than simultaneously, the property of each person shall be disposed of as if he had survived * * *."

Two lay witnesses testified. The victims were Mr. and Mrs. Doyle. Both were severely injured, one witness testifying Mr. Doyle's head was cracked open and he slowly bled to death. They both testified he survived. The Supreme Court then held:

"The presumption of simultaneous death * * * was not intended to take the place of *competent, positive and direct evidence*, and the fact of survivorship requires no higher degree of proof than any other fact in the case."

The Supreme Court then reversed the trial court, which had held there was not sufficient evidence that they died other than simultaneously.

■ Appellants contend there was no direct evidence that the insured and Betty Lou died other than simultaneously. When the testimony above related is applied to the law herein quoted, we find ourselves unable to embrace that contention. We do realize the quality of the evidence is a serious question. However, no findings of fact or conclusions of law were made by the trial court and none were requested. We must presume, therefore, in passing upon whether there was any evidence to support

the implied findings of the trial court that such court resolve in appellant's favor every issue of fact raised by the evidence, and must view the evidence in the light most favorable to such findings, disregarding all that is contrary thereto. McWilliams v. Muse, 157 Tex. 109, 300 S.W.2d 643. In applying the rule of law just stated in McWilliams we could not say there was not any evidence to support the trial court's implied findings.

 The question of the great weight and preponderance of the evidence is also raised. As a court required to pass upon the facts, we must under the constitution and rules of procedure consider and weigh all the evidence in the case and set aside the judgment and remand the cause for new trial, if we conclude the implied findings are so against the great weight and preponderance of the evidence as would be manifestly unjust. Rule 451 Vernon's Ann. Texas Rules of Civil Procedure; Article 5, Section 6, Vernon's Ann.Texas Constitution; In re Kings' Estate (King v. King et al.), 150 Tex. 662, 244 S.W.2d 660.

Not so finding the judgment of the trial court is in all things affirmed.