Jack Palmer GLOVER et al., Petitioners,

v.

Ward DAVIS et al., Respondents.

No. A–9327.

Supreme Court of Texas.

March 6, 1963.

Rehearing Denied April 17, 1963.

Harlow Sprouse and Winston R. Smith, Amarillo, Underwood, Wilson, Sutton, Heare & Berry, Amarillo, for petitioners.

C. D. Bourne, Jr., Frank D. McCown, Dumas, for respondents.

GREENHILL, Justice.

A Texas statute says that "when the insured and the beneficiary in a policy of life or accident insurance have died and there is no *direct* evidence that they have died otherwise than simultaneously, the proceeds of the policy shall be distributed as if the insured had survived the beneficiary." [1] In this case, the insured was Weldon M. Glover, who will be sometimes herein referred to as the father. The bene-

ficiary in question is Betty Lou Glover, the older daughter of Glover. Both were in the same automobile accident and died. It was stipulated in the trial court that the only question for decision is whether Betty Lou survived her father. If she did, the insurance goes to *her* heirs. If she did not, the insurance goes to others named by Glover as alternative beneficiaries in the insurance policy. It was held in the trial court, sitting without a jury, that the daughter, Betty Lou, did survive her father. That judgment was affirmed by the Court of Civil Appeals at Amarillo. 360 S.W.2d 924.

Much of the evidence, particularly that tending to show that Betty Lou survived the accident by approximately ten minutes, is set out in the opinion of the Court of Civil Appeals and need not be repeated here. While there was medical testimony that Betty Lou could not have survived the accident or her father, we shall assume for purposes of this opinion that she did survive the accident for a brief period. There is testimony that she gasped for breath, her mouth moved, and her chest heaved, for about ten minutes and then ceased. Our inquiry will be directed to whether there was "direct evidence" that the father was then dead and that he died before Betty Lou did.

The family car was being driven on the highway by Mrs. Glover. Mr. Glover, the father of Betty Lou, was in the middle of the front seat. A Mr. Hammer was on the right side. In the back were the two daughters of the Glovers, Betty Lou and her younger sister, and a man not related to the Glovers. Near Dumas, Texas, a large truck-and-trailer was parked by a filling station. Mrs. Glover apparently did not see the truck. Around midnight, she drove the car directly into and under the truck with considerable force.

T. A. Cariker, the operator of the filling station, heard the crash, got his ordinary

---

1. Probate Code § 47(e). Unless otherwise indicated references to statutes herein are to Vernon's Annotated Civil Statutes of Texas. Emphasis throughout is ours.

two-celled flashlight, and came out to investigate. The truck driver, who had been in a nearby cafe, also came and moved the truck away from the Glover car. Cariker first went to the driver's side and shone his light first at Mrs. Glover and saw no sign of life. Then he shone his light on the father. As to him, he said, "Same as with the lady. He was just laying back relaxed and I couldn't tell if he ever breathed or anything." He did not see the father move or breathe. He saw no sign of life in the front seat. He was asked if he noticed any wounds or injuries to the father, and he answered, "No, sir, I didn't. I couldn't see him as plain as I could see the lady on the outside. * * * He was laying there with his head over the back seat, turned a little bit to the left * * * toward the lady [and toward Cariker]. * * * He just looked like he was laying there relaxed." Over objection, he was permitted to testify that, "As far as I could tell he was dead; there was never no movement."

Cariker then shone his flashlight in the back seat. He saw Betty Lou lying on the seat. The other two passengers in the back seat were face down on the floor. He could see Betty Lou's chest move, and she was gasping hard for breath. She was breathing. Over objection, he testified that Betty Lou was alive.

Someone from the cafe promptly called an ambulance. At the suggestion of the truck driver (who did not testify), Cariker did not touch any of the people in the car. After a few minutes, Cariker had to go back to attend his filling station. When he returned Betty Lou was being lifted out of the car. He could not tell at that time whether Betty Lou was breathing or was alive at that time or not. While his testimony was that "they" were being removed when he returned, Cariker gave no testimony as to the father's appearance or condition upon or after the father's removal.

On cross examination, it was developed that Cariker did not reach in or touch any of the people in the car. Cariker had had no experience in diagnosing life or death, though he said he had seen other people who had been killed in automobile accidents.

The only other witness called who was at the scene of the accident was Morris Morrison, a funeral director. He was awakened around midnight and drove his ambulance alone to the accident. He estimated that it took him five minutes to get to the scene after having been called.

The truck into which Mrs. Glover had driven was carrying ammonia. There was a strong smell of ammonia in the car.

Morrison testified that he went first to the back seat of the 4-door car and started to remove Betty Lou. He did this because he said she showed signs of life: she was breathing and gasping irregularly. He also said she was "gurgling." As he removed Betty Lou in his arms, he could hear her breathing, but "just about the time I put her on the cot, she failed to breathe any more that I could detect." He estimated that it took about five minutes after he got there to get Betty Lou on the ambulance cot. She and the man on the back seat were driven in the ambulance by another employee of the funeral home who had arrived in the meantime.

Apparently Morrison also thereafter removed the people in the front seat and laid them on the ground. The father and the others were not taken to the hospital but were taken directly to the [Morrison's] funeral home. As to the father, Morrison said he saw no sign of life from him or the others in the front seat. He neither noticed, saw, nor heard anything from the father which would indicate life. But he made no effort to examine any of them, including the father. He made no attempt to feel for a pulse. He did not get down close to listen for breathing. He did not try to open their eyelids or look into their eyes. Asked if he even touched anyone in the front seat prior to the time when everyone on the back seat had been removed [which was about the time Betty Lou stopped breathing, according to Morrison], he said, "I didn't

[touch them] intentionally." He did not go into the front seat until all three had been removed from the back seat.

Morrison had had no formal training in the medical sciences. He was not an embalmer, but was a licensed funeral director. He conceded that this did not entitle him to pronounce people dead, and "I haven't pronounced anyone dead." He could not say that no one else in the car was alive except Betty Lou. His testimony was that "I saw no signs of life anywhere else." He was asked whether he had an opinion as to whether Mrs. Glover was dead or alive. Objection was made that this called for an opinion of an unqualified witness and that it was admitted that Morrison had not examined the people in the front seat. The objection was sustained. Morrison was not asked for his opinion as to whether the father was alive or dead.

The only other person called to testify was Dr. Richardson, a physician whose qualifications were stipulated. He testified that in determining life or death, "Ordinarily we look at their eyes. Their eyes are fixed and immobile and [have] no reaction to light. Then we usually check the heartbeat with a stethoscope and listen to the lungs." Some doctors, he said, use a mirror to detect breathing. "We check the pulse * * and if there is no pulse, no heartbeat, we consider them dead." These are minimum tests. "All signs of life having ceased, we pronounce them dead." He had experienced numerous calls where others, including nurses, had thought people were dead, but they were not. He said that sometimes "the heart quits" and it is eight or nine minutes before circulation is re-established.

Betty Lou was brought to him in the hospital. He said that she was definitely dead. Her skull and brains "were all over the place"; that her brain had just exploded on the impact. It was his opinion that Betty Lou had been instantly killed and could not have lived one minute after the accident. Asked to explain her "breathing," he said that her respiratory system may have been stimulated by blood, or the accident; or it may have been caused by a reflex action. He said her respiratory center might have been stimulated by the ammonia fumes. Ammonia is sometimes used to stimulate breathing, but he conceded that ammonia could not cause a dead person to breath. He said, "There could have been some blood running and gurgling," but he could not have pronounced her dead until the "breathing" had stopped.

It was his opinion that Betty Lou was much worse injured, was "torn up much more physically" than her father.

Dr. Richardson also examined the father. The examination apparently occurred later at the funeral home. He did not examine him at the scene. "His head was pretty badly injured. He had a closed compound fracture. But he was bleeding out of his ears, nose, mouth and throat, and had a compound fracture of the right leg bone." Asked if he thought the father's death was instantaneous, he said, "My opinion is that they all were killed instantaneously." Asked if the father could have been breathing or have had a heartbeat for some minutes after the collision without any apparent signs of either, he said, "His heart could have been beating. He could have had a pulse for several minutes after he was dead. He may have been breathing faintly. That's a very technical question." On further questioning, he stated that there could have been some light breathing by the father and that there could have been a pulse and heartbeat for several minutes after the collision; and this would have been possible without any outward sign to the casual observer. He repeated that he thought all of them were killed instantly, but that it was possible that several of them may have lived for a few minutes.

It was stipulated that Mrs. Glover and the younger daughter did not survive the father, Mr. Glover. Under our statute, set out above, the question is whether there is "direct evidence" that Betty Lou survived her father. Stated differently, is there direct evidence that the father died

before Betty Lou died? Our answer is that, even assuming that Betty Lou survived the crash for ten minutes or so, there is no direct evidence that the father died during that period, or that he died before Betty Lou did.

The provision on simultaneous death in our Probate Code was first enacted in Texas as a general statute in 1951.[2] It in turn was taken from the Uniform Simultaneous Death Act of the National Conference of Commissioners on Uniform State Laws.[3]

■ Prior to the enactment of the statute, where two or more persons perished in the same disaster, there was no presumption at common law that either survived or that all perished simultaneously. Because of the lack of proof in many instances, this brought about unsatisfactory results. Artificial rules were set up in some jurisdictions which presumed survival based upon the relative age, sex, physical condition, and strength of the parties. 9 Wigmore, Evidence (3rd ed.), 480 et seq.

The purpose in enactment of the statute was to remedy the situation and to carry out the intention of the insured as nearly as possible. It was suggested that in the average situation, the insured would not have intended that his property pass to a beneficiary, injured in the same accident, for a very brief period of time, at least in the absence of definite proof the beneficiary *did* survive the insured. Also to be considered on the intention of the insured [or testator] is whether he intended that his property should pass to another for tax purposes for the brief period and be taxed again upon the death of the beneficiary. It was Wigmore's position that the insured [or testator] would not have intended that his property pass to a "semi-corpse that retained only the semblance of physical vitality for a few

moments." Ibid., p. 487. Indeed, the original draft of the Uniform Act had a section, Section 9, which provided that "a priority of time shall not be deemed to be sufficiently evidenced unless such an interval of time between the deaths is shown to have elapsed * * * [during which] the survivor had a clear period of consciousness." Ibid., p. 486.

Section 9 was not adopted in the Uniform Act or by Texas. This Court in White v. Taylor, 155 Tex. 392, 286 S.W.2d 925 (1956), had before it the construction of a will, rather than the simultaneous death act. The will had a provision involving simultaneous death. It was held that when it was definitely established that one person died an hour and nine minutes before the other (the people were "pronounced dead" at definite times), the short interval of time was not controlling. The question there was not whether the parties were dead but the effect of their being pronounced dead an hour or so from each other.

The Uniform Act, approved by the Commission, did provide that where the insured and the beneficiary in a policy of life insurance died and there is *no sufficient evidence* that they died other than simultaneously, the proceeds of the policy shall be distributed as if the insured had survived the beneficiary. When this statute was introduced in the Texas Legislature, it was worded as set out above. The bill was amended in the Senate Committee to strike out the words "sufficient evidence" and substitute the words "direct evidence."[4] In that form the bill was adopted and was later transferred into the Probate Code.

■■ We have discovered no authoritative writing to explain what the Texas Legislature meant by changing "sufficient evidence" to "direct evidence." The words

2. Acts 52nd Leg., R.S., 1951, Ch. 196, p. 322, being Senate Bill 74, and codified as Article 2583a.

3. Roy R. Ray, "Three New Rules of Evidence," 5 Southwestern Law Journal

381 at 389 (1951); Legislative Section, 5 Baylor Law Review 105 (1952).

4. Senate Journal of the State of Texas, 52nd Legislature, p. 551.

"direct" and "direct evidence" have been construed in other contexts which are not particularly helpful here. We think that the Legislature meant to require a higher degree of proof than would have been required for "sufficient evidence"; that it intended that the courts should not leave the question of death to conjecture or speculation; that the matter should not be determined alone on evidence having no foundation upon the components usually regarded as the reliable attributes of death: lack of pulse or heartbeat, lack of breathing, sensitivity of the eyes to light, or other medically accepted tests; that there be strong evidence of death itself and not merely testimony from which the inference can equally be drawn (1) that the insured is unconscious and relaxed and (2) that he has actually ceased breathing, has no heartbeat, and is in fact dead.

There are many cases from the states operating under the Uniform Act. But because the circumstances of one tragedy will never exactly parallel those of another, they are not particularly helpful. These cases involve the statutory requirement of "sufficient evidence" rather than the stronger term, "direct evidence," as required in our statute. Among those cited by counsel for the heirs of Betty Lou is Sauers v. Stolz (Colo.Sup.1950), 121 Colo. 456, 218 P.2d 741. There two lay witnesses came upon an accident involving a husband and wife. They felt the wife and tested her for heartbeat and found none. Her nostrils and mouth had dust in them, indicating that there was no breathing. Her body was twisted; she apparently had a broken back. There was no movement. The witnesses also felt of the husband. One witness testified to a slight heartbeat but no other movement. The other witness said the pulse was strong, and that the husband was bleeding in spurts. It was held that this was "sufficient evidence" that the husband survived.

Similarly in Prudential Ins. Co. of America v. Spain (Ill.App.1950), 339 Ill.App. 476, 90 N.E.2d 256, a lay witness took the left wrist of an accident victim, a husband, and stated that he could not feel a pulse beat and that he could not hear him breathing; and that in the witness's opinion the man was dead. Another witness felt the vein in the neck of the wife and detected a heartbeat. The wife was observed to move, and she was heard to groan. This was held to be "sufficient evidence" that the wife survived the husband. While there are some states which hold "sufficient evidence" means an amount of proof which would ordinarily satisfy an unprejudiced mind (and some add "beyond a reasonable doubt"), Illinois rejected the test. It was held that "sufficient evidence" means a preponderance of the competent evidence.

Also cited is In re Eannelli's Estate (Wis.Sup.1955), 269 Wis. 192, 68 N.W. 2d 791. There four died as a result of an automobile-train collision. There were several witnesses at the scene who testified, including two trained troopers who made a thorough investigation. Many witnesses felt for a pulse on some or all four victims. Some said there was a definite pulse and breathing, and others said there was not as to particular victims. The case has many problems; but as pertinent here, the appellate court adjudged the evidence on "great weight and clear preponderance of the evidence." It was held that the credibility of the witnesses and the weight to be given their testimony was for the trial court to pass upon (there being no jury). The judgment of the trial court was affirmed. In our case, the question is not the credibility of the witnesses. Their testimony may be accepted as true. The problem is whether it presents that degree of proof as to be considered direct evidence of death.

On the other hand, in In re Cruson's Estate (Ore.Sup.1950), 189 Or. 537, 221 P.2d 892, 20 A.L.R.2d 219, where husband and wife had been dead for several hours after an automobile accident, and the fact of death was attempted to be shown by degrees of rigor mortis, position of the bodies and similar testimony, it was held that this was not

"sufficient evidence"; that "sufficient evidence" means that which satisfies an unprejudiced mind. The court held that it could not engage in guesswork or conjecture and that it could not balance probabilities against probabilities. To the same effect is In re Dukszta's Estate, 193 Misc. 720, 87 N.Y.S.2d 245 (reversed because of the exclusion of a suicide note, 275 App.Div. 915, 90 N.Y.S.2d 686).

In 3 Proof of Facts 236 (American Jurisprudence Annotated, 1959), the quantum of proof in these types of cases is analyzed as follows:

"Perhaps the most common type of evidence in the event of a common disaster, is the evidence of witnesses who arrive upon the scene shortly after the disaster and who observe signs of life in one victim, while at the same time observing no signs of life in another. Yet, recognizing the difficulty of determining whether death has actually occurred in a person from mere external observation, it is doubtful whether such evidence would be accorded great weight. Many conditions may result in loss of consciousness and sensation and thus have the appearance of death. Where ordinary tests for signs of life have been made by the witness, such as by attempting to detect the radial pulse or heart beat, or by listening for possible movements of the lungs which are present in breathing, greater weight will undoubtedly be accorded the evidence than evidence merely that the victim had the appearance of death. It follows that when the abovementioned tests are undertaken by a physician or other person having medical experience, greater weight is accorded the evidence than in the case of an untrained observer."

We think that the facts of this case come within the illustrations given at the forepart of the above quotation: the witnesses testified merely to the appearance of death on the part of the father. No one physically examined the father, touched him, felt for a pulse or heartbeat, or for signs of breathing. Cariker looked at the father through a car window at midnight, in the dark, save for a two-cell flashlight. Cariker did not open the door or feel the father. There was dust and the smell of ammonia in the car. He testified that "I could not tell if he ever breathed or nothing." He described him as lying back on the seat relaxed, and that he observed no movement. He did not notice any wounds or injuries to the father, explaining that he could not see him as well as the lady; but that as far as he could tell, "there was never no movement." "He just looked like he was laying there relaxed." As far as Cariker could tell the father was dead, and he thought he was dead. This was testimony merely of the appearance of death.

Similarly, the ambulance driver did not touch anyone in the front seat or go into the front seat where the father was until at least ten minutes after the accident. He busied himself with Betty Lou whom he considered to show signs of life. He conceded that he did not attempt to examine the father, feel his pulse, open his eyelids, or get down close to him and listen for breathing. Nor was the father sent to a hospital where he could have been examined shortly after the wreck. As with the witness Cariker, Morrison testified only to the appearance of death.

Our conclusion is that the proof of the fact or time of death of the father falls short of direct evidence as contemplated by the statute. There is, therefore, no direct proof that the daughter survived her father or that they died other than simultaneously. Indeed, we think there was no more than a scintilla of evidence that the father died before Betty Lou died. This being so, it is unnecessary for us to pass upon the assignment of error as to whether or not it was permissible for Cariker,

as a layman, to express an opinion as to whether Betty Lou or the father was alive or dead.

The judgments of the trial court and the Court of Civil Appeals are reversed and judgment is here rendered for petitioners.