**Edward MALONE, Appellant**

v.

**Firdosh PATEL, Appellee.**

**No. 01–10–00739–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

April 5, 2012.

---

7. *Id.* at ——.

David M. Gunn, Murray Fogler, Beck, Redden & Secrest, L.L.P., Houston, TX, for Appellant.

Bruce E. Ramage, Levon G. Hovnatanian, Martin, Disiere, Jefferson & Wisdom, L.L.P., Christopher Lynn Ashby, Lane Gavin Diamond, Ashby LLP, Houston, TX,

Madison R. Jones, Law Offices of Madison Jones, Spring, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices HIGLEY and BROWN.

## OPINION

SHERRY RADACK, Chief Justice.

Appellee Firdosh Patel sued appellant Edward Malone under contract and tort theories, alleging that Malone reneged on their agreement to be equal partners with a third person in a new company, Prescendo Consulting, LP. The trial court entered judgment in favor of Patel on the jury's verdict, and Malone appeals that here. By conditional cross-appeal, Patel challenges the trial court's granting directed verdict on his quantum meruit claim. We affirm the trial court's judgment.

## BACKGROUND

Patel came to the United States as a student from India in 1994 at the age of 22 to study at Rice University, where he earned an MBA degree. After completing his degree, he embarked on a career in the energy sector while seeking permanent residency. His immigration status was a focus at trial because it was cited as a reason that the parties' disputed business relationship was not documented in writing earlier. Patel's theory was that he and Malone always agreed to be equal partners in Prescendo upon its inception, but that Malone represented that until Patel completed the process of securing a green card, they could not reduce that agreement to writing because he was prohibited from owning equity. Malone on the other hand testified that there was never an agreement to be equal partners, and that Patel was simply an at-will employee who had been told he might be granted some ownership in the future.

### A. Patel's and Malone's Relationship

After graduating from Rice, Patel first went to work for Coral Energy, a gas and power trading business that initially sponsored his green card application through an H1B petition. To gain permanent residency status, Patel needed the Department of Labor to issue a certification approving him as an eligible immigrant to fill a particular position with a sponsoring employer, and then Patel could apply for residency. Once certification by the Labor Department was cleared and his green card application was pending, Patel was portable, meaning that he could work for any employer as long as he stayed in a similar position. Although Patel did not receive his permanent residency until December 2004, he was able to change employers several times before then because he remained in similar positions.

Malone was Patel's boss at Coral and became his close friend and mentor. Patel also recruited his Rice classmate, Meng Choo, to Coral where Choo worked with Malone and Patel as a team. When Malone left Coral, Patel also left, taking a job with Sabre in 1998. Although they worked in different cities for different employers, Patel and Malone stayed in contact with monthly telephone conversations.

Within a year, Malone called Patel with a job opportunity for them to provide consulting services on a project at a Shell company, Equiva. Malone worked as a consultant through OpenLink Financial, and Patel became a direct OpenLink employee. At OpenLink, Patel earned a $90,000 salary with a potential additional 10% bonus.

Malone then left to become a partner with MRE Consulting and continued to work on the same Shell project. He recruited Patel with the promise of a potential future partnership position at MRE.

Choo joined them later. Malone eventually left the Shell project, but Patel continued his Shell work through MRE with an annual salary of $100,000 and potential additional 75% bonus.

## B. Prescendo Consulting

After Malone had a falling out with his partners at MRE, he began discussions with Patel and Choo about leaving MRE. Eventually the three started a new business—Prescendo Consulting. Patel and Choo testified that Patel, Malone, and Choo agreed that the three would be equal owners of Prescendo. When Patel left MRE, Shell asked Patel to come to work for it directly, but Patel declined that offer and told Shell that he was starting his own company and that Shell could contract with Prescendo for Patel's services. In addition to the job offer from Shell, Patel and Choo both had other lucrative job opportunities at this juncture, including staying at MRE or going to work for OpenLink Financial. Patel turned down an offer from Openlink because he was committed to building Prescendo.

In December 2003, Patel signed a letter accepting a salary of $24,000 as an at-will employee of Prescendo with a potential for a merit-based bonus dependent on Prescendo's overall performance. Choo signed a similar letter. Patel and Choo testified that they decided on this salary amount together with Malone, and that it was so much lower than they would make elsewhere because, as owners, they were more concerned about the company building up cash reserves than drawing large salaries.

According to Patel and Choo, Malone told them that Patel's and Choo's ownership could not be documented in writing until their green cards were finalized and that their employment letters were necessary paperwork. There was trial testimony by Ken Harder, a board certified immigration lawyer, that Malone was actually mistaken about this, as Patel could own his own company and file on his own behalf—rather than rely on his employer to file for him—to maintain his status as a green card candidate beginning March 25, 2003.[1] Patel and Choo both testified that they understood they were employees, but understood the agreement to be that they also each owned one-third of Prescendo. Several documents were introduced into evidence that reflected Malone as 100% owner of Prescendo, including an insurance application and service mark application signed by Patel. Patel testified that he followed Malone's guidance when it came to documents related to starting the business and how paperwork was filled out related to reflecting ownership percentages. Malone told him that such documents had to reflect Malone as the owner "until we got a partnership in writing."

Malone, Patel, and Choo at the onset decided bring on an employee to Prescendo as well—Raymond Zhau—at a salary of $62,500 a year. All three also agreed to make the commitment to sponsor Zhau's green card—an approximately three year process under which they basically guaranteed his employment and salary. Patel and Choo testified that they drew a much smaller salary than Zhau, despite his being junior to them in experience, because as owners of Prescendo they wanted to be conservative with their own salaries so that the company could cover its expenses, prosper and grow. An email from mid–2004 was introduced at trial in which Malone proposed raising their salaries to

1. Malone did not call the lawyer he claims to have gotten the information from about Patel's and Choo's inability to own equity in a firm to testify, nor did he present any other testimony to contradict Harder's testimony that Malone's understanding was mistaken.

$50,000, but Patel responded that he was fine leaving it at $24,000.

Malone, Patel, and Choo split up both the start-up and ongoing responsibilities at Prescendo. Patel researched cellphone plans, 401(k) plans, and was in charge of marketing and keeping timesheets for himself and others from Prescendo working with him on particular projects. Choo handled the website and technical issues, such as setting up the computer server and e-mail accounts. Malone was in charge of the paperwork for setting up the company and also Prescendo's banking and accounting, including billing clients and paying bills.

Prescendo did not have separate office space. Most work was done on site at the clients' offices, and they all worked sometimes from their homes. Malone's wife, Lisa Ehrlich, is a physician, and Prescendo also set up some phone lines and a computer server at her medical office, L. Ehrlich & Associates Medical Clinic. Malone was the only Prescendo employee who was based at Ehrlich's office. Ehrlich billed Prescendo for use of the office space and equipment.

From January 2004 through May 2006, Patel, Choo, Zhau, and Ted Lao (a contractor Patel brought to work on the Shell project through Prescendo) worked on site at Shell under the contract Patel had set up for Prescendo to offer consulting services to Shell. In 2004, Patel billed 2,814 hours for a total revenue to Prescendo of $397,215; in 2005, he billed 2,730 hours for $394,305; and for a partial year in 2006, he billed 2,187 hours for $302,484. Choo billed 2,565 hours in 2004, bringing in $308,338; 2,660 hours for $315,128 in 2005; and 1,209 hours for $161,000 for a partial year in 2006. Zhau billed 2,094 hours in 2004, bringing in $145,754; 1,980 hours in 2005 for $151,242; and 724 hours for $59,000 in 2006. During these years, Patel also performed many nonbillable tasks for Prescendo—work such as recruiting additional clients that he did not do as an employee at prior employers. In April or May of 2006, Choo and Zhau rolled off their project at Shell and went "on the bench," meaning they did not have a billable project on which to work. They did eventually do some work for other clients while waiting to get back on the Shell project.

Patel and Choo did not handle Malone's billing, but Malone represented to them that he was doing work for a different client, National Energy Trading (NET). They later discovered, after this dispute arose, that Malone did not bill any hours at Prescendo in 2004 or the first half of 2005, when he began billing NET. Malone testified that during this time period he ran Prescendo, worked on a lawsuit he had brought against MRE related to a dispute over their alleged failure to honor an oral modification to their partnership agreement before he left, and sought more clients. He also ran his wife's medical office, but did not bill her office for his time.

At a point in 2004—when they were all comfortable that Prescendo's cash position had improved—Patel's and Choo's salaries were raised to $50,000, and later $85,000.[2]

---

**2.** Patel testified that it was his and Choo's understanding that Malone was receiving the same salary and bonus as the three agreed upon. Malone testified at trial that he did not pay himself a salary as an employee of Prescendo. He received funds from Prescendo in other ways. Some of Malone's legal fees in the MRE litigation were paid out of Prescendo. Prescendo also paid Malone's family's group health insurance and a management fee to a company owned by he and his wife, ERIS, that was serving as the general partner of Prescendo. Malone also received what he

These compensation decisions were made jointly by Malone, Patel, and Choo. At the end of 2004, Malone, Patel, and Choo agreed upon a bonus for each of them of $44,700. In 2004, Patel and Choo were each paid total compensation (salary and bonus) of $116,020, and in 2005, they were paid $166,000. Patel testified that his pay was lockstep with Choo's—despite Patel billing more hours and bringing in more revenue—because their agreement was that they were equal partners. In his prior experience doing similar work as an employee at other companies, their pay and bonuses would have varied based on the difference in their production.

In July 2004, Malone forwarded to Patel and Choo a letter he wrote to an attorney seeking a legal opinion about how to handle granting Patel and Malone equity. Specifically, he asked for authority about what laws or regulations "disallow such grants prior to the receipt of the greencards" and the "legal opinion or basis for granting equity following the receipt of the greencard." He also asked the attorney to address in a memorandum other ideas he had for documenting an equity grant before the greencards were received, including "granting options which do not vest until greencards [are] received (clearly if the option does not vest then it cannot be exercised and thus the employee does not technically own equity)," and he asked, "What about a contract committing the company to granting equity following receipt of the greencard?" Patel responded by thanking Malone for looking into it and said, "As I've stated before, I'm not in a hurry. Let's wait for the green card to come, and we can then put the equity program in place."

In December 2004, Patel and Choo received their green cards. They then asked Malone about putting their partnership

characterized as a "monthly draw" from

agreement in writing. Patel testified that Malone told Patel and Choo that they "should focus more on the upcoming lawsuit against MRE rather than on the mere technicality of putting together the partnership in writing." When that litigation concluded in November 2005, Patel sent an email to Malone and Choo noting that, among other things, they needed to address the "[n]ext steps on partnering agreement." Choo similarly sent an email to Malone listing one topic for an upcoming meeting as "partnership agreement." Malone responded to that email with "All good but I have new fires in the office." Patel and Choo continued to remind Malone over the next few months of the need to reduce their agreement to writing, but no writing was ever produced.

### C.  The Dispute

The dispute over ownership of Prescendo ultimately leading to this litigation came to a head in 2006. According to Patel and Choo, on the evening of September 29, 2006, they held a dinner to celebrate Malone's birthday with Patel, Choo, Zhau and his wife, and Malone and his wife. The evening wore on and people left, with only Malone and Patel remaining because Patel was supposed to give Malone a ride home. When walking to the car, Patel reminded Malone again of the need to reduce their partnership agreement to writing. Malone responded that they needed to put together a spreadsheet to figure out what would be the percentage of Patel's, Malone's, and Choo's ownership. Patel testified to being shocked and demanding to know why a spreadsheet was needed when the three had always agreed that the three each owned one-third of the company. Patel testified that Malone responded that "one-third of Prescendo was not fair to him. He should get a bigger

Prescendo.

share of the partnership." Malone further explained that he was answerable to his wife Ehrlich, who had always just considered Prescendo a continuation of MRE, and that the MRE litigation had not turned out as beneficial as they had expected for him and his wife.

Patel testified that he immediately called Choo and drove Malone to Choo's house, despite the late hour. Patel and Choo testified that Choo demanded to know why a spreadsheet was necessary as well. According to Patel and Choo, for the first time Malone told them he considered them only employees that he could fire whenever he wanted—not partners—and and that Malone "even taunted [them] by asking [them] what were we going to do, sue him?"

Given the turn of events, Patel and Choo made clear that they wanted to split up the pool of money that had been earned previously. They left the conversation with an agreement that Choo would put together a spreadsheet the next day showing what each partner was owed, and Malone was supposed to send them the company's financial information. Patel testified that until this point, they "never even checked the books, we trusted Malone so much." According to Patel, at that point "the trust had just gone between the three of us" so the understanding was that the "only focus would be on splitting of the cash pool— irrespective of whether we decided to continue working together or not, because there was a big chance that we would not continue working together after this incident."

The following day, rather than forward the financial information to Choo, Malone sent an email to Patel and Choo stating, "After thinking on this overnight, I will put the spreadsheet together." Patel responded with "Ted/Meng, since we are having discussions on splitting up the cash pool with Prescendo, please hold off on any plans to invest this cash pool in the natural gas related royalty trust that we were talking about a couple of weeks earlier." Malone responded with "Firdosh, at the end of the day, I have the ultimate and complete authority over Prescendo funds and investment decisions." According to Patel, this response was inconsistent with how they had done business since Prescendo's inception; in the past, all decisions had been made by the three of them.

The next week, Patel filled out paperwork he found on the Internet to form his own company "Glenrisk Consulting." He testified this was in response to his perception that Malone had turned on them and he needed to protect himself in case Malone made good on his threat to fire him. When Patel told his immediate supervisor at Shell, Derrick Jones, that there was a strong possibility that he might not remain with his current venture, Jones told Patel he wanted him to continue at Shell and had Shell's human resources department send him documents to facilitate his continued working with them. He did not return the documents to Shell, because his hope was still that something would work out with Prescendo so he would not have to walk away from the company he started and where the majority of his savings were tied up. He also testified that he was hesitant to walk away from the ten-year relationship he shared with Malone and Choo. During October, while he continued to work at Shell, he convinced Shell to bring Choo and Zhau back on their project through Prescendo.

Malone finally produced a spreadsheet and sent it to Patel and Choo on November 18, 2006 along with an email that it was a "proposal, not an offer." The transmittal email explained that it represented Malone's "proposed approach to allocating a portion of historical Prescendo

retained earnings to each of you" and listed other matters that would need to be resolved as well, including robust releases, formal contracts, insurance for buy-out in case of death, form of equity interest including exit/wind down/cash out provisions and employment contracts or agreements for exclusive professional services contracts dedicated to Prescendo. Malone's billings were not reflected on the attached spreadsheet, and Malone told them that his billing were "nonnegotiable" such that he expected to share in Patel's and Choo's billings, but that they were not entitled to any of his billings. A week later, Malone asked Patel to meet him without Choo. After getting Choo's blessing for him to attend this meeting, Patel went and was surprised to find Ehrlich there also. Ehrlich did most the talking, urging him to accept Malone's new proposal and telling him that Prescendo "could have only one king and that was Mr. Malone."

The relationship deteriorated from that point, and Patel decided to pull out of Prescendo. He wrote an email to Malone to that effect, resigning as of November 30, 2006. He returned home that night to find messages from Ehrlich on his answering machine, which were played at trial. Ehrlich expressed anger and frustration that Malone "really feels badly" and is "sitting down there trying to figure out how to do what is right by [you] guys . . . figure out what is the fair dollar amount out of the money." She stated that she was "very happy about how things are progressing along and . . . would like the relationship to be terminated at some point." She stated that she felt vindicated, was shocked by Patel's lack of gratitude, felt he had "just unprofessionally resigned," and that she would "have no problem walking away and not giving you a penny." Patel testified that these messages were consistent with his understanding from what Malone had told him that

Malone was unable to give Patel and Choo their fair share because it "was unsuitable to Dr. Ehrlich."

On December 1, 2006, Patel signed a consulting agreement between Glenrisk and Shell, and continued on his project at Shell. Choo and Zhau eventually left Prescendo, with Choo later joining Glenrisk.

At trial, Malone disputed Patel's and Choo's version of events. He testified that he never had an agreement to be partners with Patel or Choo. He posited that the start-up work Patel and Choo did for Prescendo that they were not paid for was akin to preparing for and interviewing with Malone for the opportunity to join Prescendo as employees only. Further, he believed that they could not own "an interest in an entity that sponsored their own green card." He claims to have chosen the $24,000.00 as the salary for Patel and Choo because he was taking on tremendous risk to fund the company and would be committing to pay their salaries when their green cards were not finalized, which he understood could take at least another year. He did plan, however, to raise their salaries when it was feasible, which he did. He also disputed Patel's claim that they all made salary and other decisions together. He testified they "never discussed, you know, sharing equity after his green card prior to, you know, that September 29 blow up."

On September 29, 2006, Malone did not consider Patel "a partner in the sense of— of an ownership stake in a company I have." Malone testified that after Patel and Choo pushed him so hard about partnership that night at Choo's house, he told them that if they wanted to see an "equity program in place at Prescendo," they needed to create a spreadsheet to "lay out how you think that computation model

should be structured in order to put, build or to properly incentivize a professional services company." He was "shocked, ... literally was flabbergasted completely with the tone that Mr. Patel, and to a degree, Mr. Choo, had" with him that night because, according to Malone, there had never been a prior discussion about being partners. At most, they had "discussions about, hey, I will put an equity program in place at some point in the future." That would never have included, however, an agreement to be equal partners. He changed his mind about having Choo do the spreadsheet and decided to do it himself, but he was too busy for the next six weeks to get it done any sooner. He ultimately sent what he considered to be a long term proposal that would define the relationships and the obligate the parties going forward, while proposing to give Patel some financial credit in the form of retained earnings for past "project delivery, bringing in new business and recruiting and managing talent." His proposal was "rejected pretty categorically," and Patel left Prescendo a couple of weeks later.

## TRIAL COURT PROCEEDINGS

Patel sued Malone, Lisa Ehrlich, Dr. Ehrlich & Associates, and Prescendo under numerous contract and tort theories. Malone and Prescendo counterclaimed on a breach of fiduciary duty theory.

At the close of the evidence, the trial court granted directed verdict on several claims and submitted others to the jury. All the jury questions were predicated on the threshold question of whether the parties agreed to be equal partners in Prescendo, which the jury answered affirmatively:

> Did Firdosh Patel and Ted Malone agree that they would be equal partners in Prescendo Consulting, LP, together with Meng Choo?
>
> Answer Yes or No ___Yes___

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

As damages, the jury awarded to Patel $495,000, representing the "amount of money Firdosh Patel would receive as an equal partner in Prescendo, less the value of what he was paid," as well as attorneys' fees. The jury also found that Malone did not "comply with his fiduciary duty to Firdosh Patel," but no separate damages question on that claim was answered by the jury.

The jury rejected the remainder of the Patel's submitted claims, including his fraud claims against Malone and Prescendo and his tortious interference claim against Malone's wife, Ehrlich. The jury also rejected Malone's counterclaims against Patel for breach of Patel's fiduciary duties to Malone and Prescendo.

The trial court entered a final judgment on the jury's verdict, awarding Patel $495,000 in actual damages, prejudgment and post-judgment interest, and attorneys' fees.

## THIS APPEAL

In his first issue, Malone argues that the evidence is "legally and factually [in]sufficient to prove that Patel and Malone were partners." In his second issue, he contends that because there were documents showing Patel as an employee, Patel should not be allowed to "alter his position now and claim to be a partner." Finally, in his third issue, Malone asserts that the evidence is "legally and factually [in]suffi-

cient to prove Patel's case for breach of an oral promise that he and Malone would become partners in the future."

■■■■ By conditional cross-appeal, Patel argues that "the trial court erred in granting a directed verdict in favor of [defendants] on Patel's quantum meruit claim."[3]

## EVIDENCE OF AGREEMENT

Malone argues that the trial court's judgment should be reversed because the evidence conclusively proves that "Patel's role in Prescendo was that of an at-will employee, not a partner." He asserts that the supreme court's decision in *Ingram v. Deere*, 288 S.W.3d 886 (Tex.2009) setting forth the "main circumstances that indicate the creation of a partnership" is dispositive, and that the lack of evidence of those circumstances is fatal to Patel's claims. Additionally, Malone points to the documentary evidence—such as Patel's INS papers, W–4 forms, pleadings in another lawsuit, and insurance forms—indicating either that Patel was an employee or that Malone wholly owned Prescendo.

.Patel responds by noting that the jury "was not asked whether a partnership existed"; rather, the jury "found that Patel and Malone agreed to be equal partners." Thus, Patel argues, the issue is not whether there are indices that a partnership existed as addressed in *Ingram*. Instead, the issue is whether there is evidence to support the jury's finding that the parties had an agreement. Patel argues that recovery under his breach-of-contract claim is amply supported by evidence of the parties' agreement to own Prescendo equally, including (1) direct testimony from several witnesses about such an agreement, (2) Pate's and Choo's free work for Prescendo, (3) Patel's and Choo's acceptance of nominal salaries, and (4) references to the partnership in various emails. Patel further contends that the documents reflecting Patel was an employee "do not conclusively prove that the parties did not agree to be equal partners." He notes that an employee can own an interest in his or her employer's business, and argues that the jury could have reasonably concluded that the documents did not yet

3. A brief discussion about the oral argument is warranted here. Patel's theory at trial and in his brief has consistently been that Malone, Choo and he had all agreed from the onset of their discussions to be equal partners in Prescendo as soon as it was formed. Malone's position at trial was that he never agreed, and in fact would never have agreed in the future, to be equal partners with Patel and Choo. His briefing maintains that position, and makes the alternative argument that even if Malone hypothetically had agreed to be equal partners at the onset, Patel's signing an employment letter weeks later shows that the parties changed their mind. Inexplicably, with no reference to the actual contrary trial testimony, Patel's counsel at oral argument instead insisted repeatedly the parties agreed to be partners *at some undefined time in the future.* In response, Malone's lawyers argued that there is a causal disconnect between that theory and the damages model supporting the jury's damages award.

It is axiomatic that "[a]ttorneys who request argument should arrive at oral argument ready to answer questions about both the facts and the law of the case." *El Paso Natural Gas Co. v. Strayhorn*, 208 S.W.3d 676, 681 (Tex.App.-Texarkana 2006, no pet.). Whatever tactical advantage Patel's counsel sought in presenting a new factual theory at oral argument that is inconsistent with the theory presented to the jury, we confine our review the sufficiency of the evidence to support the jury's findings in light of the factual theories actually presented at trial and the arguments made in the parties' briefs. *Cf. Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 772 (Tex.App.-Houston [14th Dist.] 2004, no pet.). For the same reasons, we decline to consider Malone's causation arguments raised for the first time at oral argument in response to Patel's counsel's new argument. *Id.*

reflect the parties' partnership status because Malone had told Patel and Choo that the partnership could not be put in writing until they had received their green cards.

## A. Standard of Review

In a legal sufficiency, or "no-evidence" review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). In making this determination, we will sustain a legal sufficiency challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. We credit favorable evidence if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable fact-finder could not. We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight accorded to their testimony. *Id.* at 819. Although we consider the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

In a factual-sufficiency review, the court must examine both the evidence supporting and contrary to the judgment. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001); *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.

1989). We may set aside the verdict only if the evidence that supports the jury's finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Nip*, 154 S.W.3d at 769.

An ultimate fact may be established by circumstantial evidence. *State v. $11,014.00*, 820 S.W.2d 783, 785 (Tex.1991) (per curiam). "Circumstantial evidence is the proof of collateral facts and circumstances from which the mind arrives at the conclusion that the main facts sought to be established in fact existed." *Glover v. Davis*, 360 S.W.2d 924, 928 (Tex.Civ.App.-Amarillo 1962), *aff'd*, 366 S.W.2d 227 (Tex. 1963). An ultimate fact may be established by circumstantial evidence when the circumstances relied on are of such a character as to be reasonably satisfactory and convincing, and are not equally consistent with the nonexistence of the ultimate fact. *See Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 401 (Tex.App.-Houston [1st Dist.] 1993, writ dism'd w.o.j.).

The fact-finder is the sole judge of the witnesses' credibility and the weight to be given their testimony, and the fact-finder may choose to believe one witness over another. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003). Because it is the fact-finder's province to resolve conflicting evidence, we must assume that the fact-finder resolved all evidentiary conflicts in accordance with its decision if a reasonable person could have done so. *See id.* An appellate court may not impose its own opinion to the contrary of the fact-finder's implicit credibility determinations. *Id.*

## B. Analysis.

Malone urges us to conduct our sufficiency review with reference to the factors in *Ingram v. Deere* to determine whether

the jury's finding in response to Jury Question No. 1 is supported by evidence that a "partnership existed." Patel on the other hand argues that the case was tried and submitted on a contract theory; namely, whether Patel and Malone had an agreement that they would be equal partners. Thus, as a threshold matter, we must resolve the relevant law against which the evidence should be measured to determine sufficiency.

### 1. *Ingram v. Deere*

*Ingram* interpreted the Texas Revised Partnership Act (TRPA), which governs partnerships formed between January 1, 1994 and December 31, 2005—the same period during which Patel asserts a partnership with Malone and Choo was formed.[4] The TRPA provides that "an association of two or more persons to carry on a business for profit as owners creates a partnership," Tex.Rev.Civ. Stat. art 6132b–2.02(a), and articulates five factors that indicate the creation of a partnership:

(1) receipt or right to receive a share of profits of the business;

(2) expression of an intent to be partners in the business;

(3) participation or right to participate in control of the business;

(4) sharing or agreeing to share:

(A) losses of the business; or

(B) liability for claims by third parties against the business; and

(5) contributing or agreeing to contribute money or property to the business

Tex.Rev.Civ. Stat. art 6132b–2.03(a). It further provides that one "of following circumstances, by itself, does not indicate that a person is a partner in business":

(1) the receipt or right to receive a share of profits:

(A) as repayment of a debt, by installments or otherwise;

(B) as payment of wages or other compensation to an employee or independent contractor;

(C) as payment of rent;

(D) as payment to a former partner, surviving spouse or representative of a deceased or disabled partner, or transferee of a partnership interest;

(E) as payment of interest or other charge on a loan, regardless of whether the amount of payment varies with the profits of the business, and including a direct or indirect present or future ownership interest in collateral or rights to income, proceeds, or increase in value derived from collateral; or

(F) as payment of consideration for the sale of a business or other property by installments or otherwise;

(2) co-ownership of property, whether in the form of joint tenancy, tenancy in common, tenancy by the entireties, joint property, community property, or part ownership, whether combined with sharing of profits from the property;

(3) sharing or having a right to share gross returns or revenues, regardless of whether the persons sharing the gross returns or revenues have a com-

---

4. The TRPA expired on January 1, 2010. *See* Act of May 31, 1993, 73rd Leg., R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3887, 3890 (expired January 1, 2010) (former Tex.Rev.Civ. Stat. art. 6132b–2.02(a), 6132b–2.03(a)). After that date, the Texas Business Organizations Code (TBOC) applies to all partnerships, regardless of their formation date. *Ingram*, 288 S.W.3d at 894 n. 4. Both the TRPA and the TBOC identify the same factors as relevant to whether a partnership has been formed. *Compare* Tex. Bus. Orgs.Code Ann. § 152.052(a)(Vernon 2012), *with* Tex.Rev.Civ. Stat. art. 6132b–2.03.

mon or joint interest in the property from which the returns or revenues are derived; or

(4) ownership of mineral property under a joint operating agreement.

TEX.REV.CIV. STAT. art. 6132b–2.03(b).

In *Ingram,* the plaintiff alleged that he had an oral partnership agreement with the defendant providing him a one-third ownership in a medical clinic. 288 S.W.3d at 891. The jury found that the plaintiff and defendant entered into a partnership agreement, and that the defendant breached both that agreement and his fiduciary duty to the plaintiff. *Id.* at 892.

The relevant jury question in *Ingram* asked whether the plaintiff and defendant "form[ed] a joint venture without giving it a name for the purpose of a interdisciplinary pain clinic that included the following terms: ... [t]hat [plaintiff] and [defendant] would each own 50% of the unnamed joint venture ....." *Id.* at 904 (Johnson, J., concurring). The jury was further instructed to consider the five TRPA factors quoted above in deciding whether the joint venture was created. *Id.*

Resolving an issue of first impression, the supreme court held that—unlike under the common law scheme that the TRPA replaced—evidence in support of all five TRPA factors is not required to support a jury's finding that a partnership exists. *Id.* at 897. Rather, the court adopted a totality-of-the-circumstances approach, "considering all of the evidence bearing on the TRPA partnership factors," *id.* at 896, on a continuum:

> Evidence of none of the factors under the Texas Revised Partnership Act will preclude the recognition of partnership, and even conclusive evidence of only one factor will also normally be insufficient to establish the existence of a partnership under TRPA. However, conclusive

evidence of all five factors establishes a partnership as a matter of law.

*Id.* at 904. Because the court concluded that the plaintiff had "not provided legally sufficient evidence of any of the five TRPA factors" to prove the existence of a partnership, it rendered judgment that the plaintiff take nothing. *Id.*

The supreme court in *Ingram* identified several differences between the TRPA and the prior common-law model, noting that the "TRPA contemplates a less formalistic and more practical approach to recognizing the formation of a partnership." *Id.* at 895. For example, unlike under the common law, where "intent to be partners was a 'prime,' although not controlling, element in the creation of a partnership," *id.* at 896 (quoting *Coastal Plains Dev. Corp. v. Micrea, Inc.,* 572 S.W.2d 285, 287 (Tex.1978)), the "TRPA does not require direct proof of the parties' intent to form a partnership." *Id.* (citing TEX.REV.CIV. STAT. art 6132b–2.02) (stating two or more persons can form a partnership regardless of "whether the persons intend to create a partnership"). Similarly, while the sharing of profits and losses was "essential" to prove a partnership under the common law, neither is necessarily required to demonstrate a partnership under the TRPA. *Id.* at 896.

### 2. *Ingram* presented a different issue to the jury than this case.

Our sufficiency review must begin not with legal concepts, but with the jury's charge. *E.g., Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.,* 299 S.W.3d 106, 112 (Tex. 2009). We agree with Patel that there are meaningful differences between the jury submission in this case and the one submitted in *Ingram. Ingram's* analysis, therefore, is not directly on point.

The charge in this case followed the general Pattern Jury Charge format for

submitting "the existence of an agreement." Tex. P.J.C. 101.1 cmt.[5] In *Ingram*, the broad-form submission inquired whether a joint-venture (i.e., partnership) was formed and was accompanied by instructions to consider the five TRPA factors. *Id.* at 904 (Johnson, J., concurring); *cf. Regal Fin. Co. v. Tex. Star Motors, Inc.*, 355 S.W.3d 595, 601 (Tex.2010) ("[A] jury charge submitting liability under a statute should track the statutory language as closely as possible."). In this case, the court submitted a more discrete issue, "Did Firdosh Patel and Ted Malone agree that they would be equal partners in Prescendo Consulting, LP, together with Meng Choo?" Rather than instruct the jury on the TRPA factors, the charge instructed the jury that "[i]n deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions." *See* Tex. P.J.C. 101.3 ("submit[ ] with the question of the existence of a contract (PJC 101.1) to confine the jury's deliberations on the issue of contract formation to legally appropriate factors").

The jury question in this case focuses on an issue more narrow than the one in *Ingram*. Under the *Ingram* charge, the existence of a partnership could be found and supported without any evidence of the parties' intent to form a partnership, as "expression of an intent to be partners in the business" was only one factor submitted disjunctively to the *Ingram* jury, and the supreme court specifically noted that a partnership could be found even with no evidence of intent to form a partnership. *Ingram*, 288 S.W.3d at 895–96. By con-

trast, the only factual issue submitted in this case was whether the parties agreed that they would be equal partners. We accordingly agree with Patel that our sufficiency review is not the same as the *Ingram* court's analysis of the TRPA factors for finding a partnership exists, but rather is confined to whether there is evidence of the parties' agreement to be equal partners.

### 3. There is legally sufficient evidence to support the jury's finding of agreement.

Malone challenges the sufficiency of the evidence of agreement on two grounds. He contends that (1) there is legally insufficient evidence of a partnership, as measured against the factors in *Ingram*, and (2) the documentary evidence conclusively disproves a partnership. In considering his legal sufficiency challenge to the jury's finding of agreement, we address first whether there is evidence of an agreement, and then whether the documentary evidence Malone points to conclusively disproves an agreement.

#### a. There is evidence supporting the jury's finding of an agreement.

■ Arguing that the *Ingram* factors are the only "circumstances" that the jury could consider to determine if a partnership exists, Malone asserts that "the evidence as a whole shows that there was no partnership." Specifically, he argues that there is (1) no expression of intent to be partners, (2) no sign of profit-sharing, (3) no sharing of losses, (4) no control, and (5) no contribution of capital. Patel responds by pointing to evidence indicative of an agreement, including (1) direct testimony about the agreement, (2) Patel's and

---

5.  PJC 101.1 Basic Question—Existence
    Did *Paul Payne* and *Don Davis* agree [insert all disputed terms]?

[Insert instructions, if appropriate]

Choo's free work, (3) Patel's and Choo's nominal salaries, (4) and various emails indicating there was an agreement.

The ultimate question for us here is whether "[c]onsidering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the trial evidence would enable reasonable and fair-minded people to find" that Patel and Malone agreed that they would be equal partners in Prescendo. *White Oak Operating Co., LLC v. BLR Const. Cos., LLC*, 362 S.W.3d 725, 732 (Tex.App.-Houston [14th Dist.] 2011, no pet.) (citing *City of Keller*, 168 S.W.3d at 823, 827). In doing so, we "look at the totality of the known circumstances rather than reviewing each piece of evidence in isolation." *Felker v. Petrolon, Inc.,* 929 S.W.2d 460, 464 (Tex.App.-Houston [1st Dist.] 1996, writ denied) (citing *Brinegar v. Porterfield*, 705 S.W.2d 236, 238 (Tex.App.-Texarkana), *aff'd*, 719 S.W.2d 558 (Tex. 1986)). Any evidence has probative value if it contributes to the proof of an issue. *Id.* "A single factor standing alone may be insufficient, but when joined by other factors constituting a significant whole, the combination can justify a conclusion." *Id.* "To sustain a finding of fact based upon circumstantial evidence it ... is necessary to show only that one conclusion or inference is more probable than any other." *Id.* (citing *$56,700 in U.S. Currency v. State*, 730 S.W.2d 659, 660 (Tex.1987)).

In arguing that there was no evidence of "expression of intent to be partners," Malone states that there must be evidence of "expressed intent," which can include "the parties' statement that they are partners, one party holding the other party out as a partner on the business's letterhead of name plate, or in a signed partnership agreement." Four witnesses testified, with varying degrees of specificity, that Malone expressed such an intention to be partners with Patel and Choo.

Patel testified that four people who made up the core business consulting group at MRE—Patel, Malone, Choo, and Pallav Jain—had several meetings to discuss leaving MRE and their future plans. Patel testified that ultimately "[t]hree of us, Mr. Meng Choo, myself and Mr. Malone, we decided to create a new entity where we would be co-partners. Mr. Pallav Jain, on the other hand, decided to go and work for a company called McKinsey Consulting, which is another consulting company." Patel further testified that, "We all agreed we were equal partners" and that "Mr. Malone told us that we just needed an oral agreement to have a partnership and the three of us agreed to be equal partners; Mr. Meng Choo, Mr. Malone and myself." His understanding was that proceeds would be shared equally among the partners after they equally shared overhead and other expenses.

Choo similarly testified about these meetings about leaving MRE when Malone, Patel, and Choo agreed to be partners in Prescendo:

Q. I want to focus on the latter quarter of 2003. Did you have any meeting with Mr. Patel and Mr. Malone?

A. Yes.

Q. And I want to focus on before Prescendo was formed. Can you tell me what was—why you were having these meetings?

A. Around that point in time, there were disagreements between the other partners at MRE and Mr. Malone. And we were getting quite concerned about, you know, if we can survive inside of

MRE, meaning if we can go on in that company.

Q. What were some of the options you were considering? And I want to talk—leaving aside Prescendo, what other options did you consider?

A. Just going out and getting a job at another company, yes. you?

Q. Ultimately, was there a decision made between the three of

A. Yes.

Q. What was that decision?

A. We decided to form a new company called Prescendo Consulting.

Q. Did y'all form an agreement on that basis?

A. Yes.

Q. What was your agreement?

A. We would own the company together.

Q. When you say "together," who were the members of this agreement?

A. It was Mr. Malone, Mr. Patel and myself.

Q. Did anyone besides you three attend these meeting?

A. On a couple of occasions, yes.

Q. Who else attended?

A. The gentleman's name is Pallav Jain.

Q. Did he enter into the agreement to become a member of Prescendo?

A. He left to go work for a different company.

Q. Did Mr. Malone make any representation during these meetings about— well any representation?

A. We agreed that we would own the company together, meaning we equally owned it. We would, you know, share in the profit and the loss of the company.

Choo further explained his understanding that the parties had a verbal agreement that was not reduced to writing at the time because Malone represented that until Choo's and Patel's green cards were received, "we could not put it on paper."

Jain's testimony about the early meetings and the parties' agreements was consistent with Patel's and Choo's. In addition, he testified that he and Malone "kept in touch about Prescendo, [and] about the MRE lawsuit" after Jain left MRE. When asked whether there was "any doubt in [his] mind who the owners of Prescendo were," he responded, "No. . . . They were Meng, Firdosh and Ted. It was their company." Malone had earlier enticed Jain to accept a job at MRE with the idea that the four could work at MRE for a while and then split out and start a new company together.

Finally, Terry Hirsch, Patel's former supervisor at Shell, testified that "Ted [Malone] also called me later and basically told me the same thing that Firdosh [Patel] did, that they were going to go out on their own, form their own company."

In arguing there is no evidence to support the jury's finding that Malone agreed to be equal partners with Patel, Malone's brief only acknowledges Hirsch's testimony, which he claims is too vague to evidence such intent. Malone then asserts that there is "no evidence to support the requisite expression of an agreement among Patel, Choo, and Malone" because "there is no written partnership agreement" and because "no writing supports the creation of the partnership, and no writing from the following three years even mentions the purported agreement." Malone's brief then chronicles a variety of ways that Malone and or Prescendo could have held out Patel as a partner, but did not.

Malone's emphasis on the lack of a written contract or other writings is misplaced. The law recognizes oral agree-

ments, *see generally e.g., Ingram,* 288 S.W.3d at 894–97; thus, the lack of a written agreement cannot conclusively establish that an oral agreement does not exist. The failure to reduce an agreement to writing (as well as any proffered explanation for that failure) is relevant for the jury's consideration, but does not negate the legal sufficiency of the direct evidence of Malone's expressions of agreement to be equal partners with Patel in Prescendo.[6] The direct testimony of Patel, Choo, Jain, and Hirsch is some evidence in support of the jury's finding that Malone agreed to be equal partners with Patel and Choo.

Malone next argues that there "is no sign of profit sharing or a right to profit-sharing," as "Patel never receive any profits, a share of revenues, or any form of compensation that would suggest the existence of a partnership." Instead, Malone points out, Patel was paid a salary, and each December received a letter "explaining the determination of the bonus to be paid in addition to his salary." Because Patel never "complain[ed] that he had not received his 'share' of profits" and because, under *Ingram,* "a share of profits paid as wages to an employee is not indicative of a partnership interest," Malone contends there is no evidence of this *Ingram* factor. Malone similarly contends that "Patel adduced no evidence of an agreement to share losses or liabilities."

We agree that there is no evidence that Patel actually received a share of profits other than to the extent profits informed any bonus he received. There is evidence, however, of his right to share profits that supports the jury's finding of an agreement. Patel testified to his understanding that "the divisions of proceeds" would be

calculated by "tak[ing] what we make in the company, less all the expenses, overhead, what it was, whatever was the balance, bank balance, you just divide by one-third, one-third, one-third." Choo likewise testified that "our agreement was to share the profit and the loss equally."

There is thus evidence through Patel's and Choo's testimony of an agreement to share profits, and they both testified to their understanding that, by virtue of their being partners, any losses would be shared as well. Patel also explained that early on, the three of them agreed to sponsor Raymond Zhau's application for a green card, which is an example of a three-year financial commitment indicative of such an implicit agreement, in that "all three of us were agreeing to share in any losses that Prescendo would take in the event that Mr. Raymond's rule [sic] was sitting on the bench." Patel's and Choo's testimony is some evidence that the parties agreed to be equal partners.

There is also evidence that Patel accepted a low salary and bonus with the understanding that profits in Prescendo's early years would be invested back the company, thereby increasing the value of his ownership:

> [T]he $24,000 a [year] was—it was just a nominal amount. In the big scheme of things, it did not mean a whole lot. I was one-third owner of the company. What mattered was the total value of the company. We were building our own entity. When you're building your own entity, what you take right up front does not matter a whole lot.

Choo testified to a similar understanding:

6. To establish that there is "no evidence" of his expressed intention to be partners with Patel, Malone also points to documents Patel executed that he asserts conclusively disprove that he and Patel were partners. We address this contention separately later in this opinion.

Q. Well, if you were a partner and believed that you had a right to a third, why didn't you distribute all the money in Prescendo?

A. Because at the time, you know, we were in this lawsuit with MRE Consulting and we wanted to be at least on the conservative side, make sure that there's enough money around. We didn't want to just take everything out.

Q. Whose idea was it to leave money in Prescendo?

A. I think it was the three of us.

Patel argues that these nominal salaries are also evidence that an agreement existed to be equal owners of Prescendo. They both agreed initially to starting salaries at Prescendo of $15,000—a figure that they decided to raise to $24,000 when Prescendo began operating in January 2004 after Patel landed Shell as a client. Had Patel not left MRE, he would have made $175,000—$180,000. Choo would have made $150,000, a lower figure because he typically billed less hours than Patel. Raymond Zhau, on the other hand, was "very junior" to Patel and Choo in terms of experience but had a starting salary at Prescendo of $62,500, a figure much closer to what Zhau would have made at MRE. Patel testified that he accepted this lower salary that was equivalent to Choo's—despite his making more than Choo at MRE—because "we were all equal partners." Zhau made more than Patel and Choo because he "was not a partner. He was a regular employee in the company." Thus, he "was not getting part of the value of the company."

An email was introduced in which Malone, in 2003, proposed raising the base salaries of Patel and Choo from $24,000 to $50,000. Patel opted to leave his salary at $24,000, responding "I'm okay with my salary—don't need a raise right now." There was evidence that throughout 2003, 2004, and 2005, as revenues went up, Pa-

tel's and Choo's salaries increased, and they received bonuses in amounts that Malone, Patel, and Choo agreed upon. Despite Patel billing more hours and bringing in significant more revenue, Patel's and Choo's compensation was always equivalent because they considered themselves equal partners. We agree with Patel that the evidence of his and Choo's nominal salaries with Prescendo (despite other lucrative job opportunities), their declining Malone's suggestion that their salaries be doubled, and their lock-step compensation scheme is some evidence that they agreed to be partners.

Malone next contends that there was no evidence of a "participation or right to participate in control of the business." He cites *Ingram* for the proposition that the "right to control a business is the right to make executive decisions." *Ingram*, 288 S.W.3d at 901. He also asserts that *Ingram* supports the proposition that "mere knowledge of executive decisions, or even input into those decisions, does not constitute control." Thus, he contends, "Patel may have been aware of various personnel decisions (such as sponsoring Rayonod Zhou for his green card), and aware of Prescendo's financial condition (even participating in setting bonuses), but he has produced no evidence that he actually made any executive decisions on behalf of the company."

In *Ingram*, the plaintiff argued that "he had control because [the defendant] discussed with him how much the clinic made, the amounts paid to the staff, and the need to hire [the defendant's wife] as personnel director." *Ingram*, 288 S.W.3d at 901. Noting that this was the only evidence proffered to demonstrate a right of control, the supreme court held this evidence fell short.

[B]eing sporadically provided information regarding the business does not in-

dicate that [the plaintiff] had control of or the right to control the business. At most, [his] evidence demonstrates that [the defendant] talked with [the plaintiff] about the business. But owners talk with consultants, employees, accountants, attorneys, spouses, and many others about their businesses, and these conversations do not establish that these people have control of the businesses. Likewise, those same classes of people may have the opportunity to look at the businesses' books, but once again, a review of the books itself is not evidence of control. [The plaintiff] submitted no evidence that he made executive decisions or had the right to make executive decisions and has shown no evidence of this factor.

*Ingram*, 288 S.W.3d at 902. While *Ingram* holds that access to information does not demonstrate control, we do not read *Ingram* so broadly as Malone to exclude evidence of input into executive decisions as evidence of control.

Malone was in charge of Prescendo's accounting and business functions, but the jury in this case heard evidence that Malone did more than share information with Patel. Malone, Patel, and Choo held weekly "partnership meetings," and many decisions were made collaboratively. According to Patel, the "three would discuss topics, and then defer to whoever we thought was the most experienced." Choo likewise testified that decisions were made by all three. When they decided to form Prescendo, Malone, Patel, and Choo decided together to hire Raymond Zhau and make the commitment to sponsor his permanent residency application. Malone, Patel, and Choo together made the decision about Patel's, Choo's, and Zhau's salaries, and about the amounts of bonuses to be paid. When Malone wanted to hire a ex-colleague from Coral, Patel vetoed that decision and he was not hired. An email was introduced in which Malone consulted with Patel and Choo about raising their salaries—an idea they rejected. The evidence that Patel had the right to exercise, and did exercise, some control over executive decisions of Prescendo supports the jury's finding of an agreement to be equal partners.

Finally, Malone argues that there is no evidence that Patel contributed money or property to Prescendo. He notes that Malone "contributed all of Prescendo's start-up capital" and that Patel only "used a few personal items in his work, such as his car, cell phone, and personal computer." He points to the supreme court's admonishment in *Ingram* that "[a]t a minimum, the putative partner would have to prove that any such value can be distinguished from services rendered or property given as an employee." *Ingram*, 288 S.W.3d at 903; *see also id.* at 902 ("Employees may contribute to business endeavors by lending their time and reputation, but that is not a contribution to the venture indicative of a partnership interest."). According to Malone, Patel's evidence "shows mere use [of personal items], not a contribution" as a partner.

Patel testified that he, Malone, and Choo "split up the tasks . . . in getting the [Prescendo] up and running" during the last quarter of 2003. Patel "researched cellphone plans, 401(k) plans, marketing brochures, what needed to be done for [the] business logo, design, et cetera." Choo came up with the company name "Prescendo" and "focused mostly on setting up [the] website and getting e-mail accounts running." "Malone focused on the paperwork for setting up the company and also in banking and accounting." Patel testified that he did this work without remuneration because "I thought that is something you just had to do when you're

an owner of your own company." Patel also worked at bringing Shell on as the first client of Prescendo in January 2004, turning down Shell's request that he come to work for it directly as an employee, instead telling Shell that he "was committed to creating and building my own entity, Prescendo." As for equipment, he testified that he used his own desktop, office supplies, printer, cellphone, car, and apartment as his home office. Patel testified that, in 2003, he would not have joined Prescendo if he was not a partner. He further testified that, in addition to more pay, if he had stayed at MRE or taken instead a job with Shell or Openlink, he "would not even be working the additional unbillable hours just building up the company."

Choo was not paid for his initial work at Prescendo either, which he considered his "sweat equity" into the company. He similarly testified to purchasing a computer and office supplies, which he considered his "contribution to starting up the company." Patel's and Choo's testimony here is some evidence of an agreement to be equal partners.

Finally, in support of the jury's finding, Patel also points to an email he sent to Malone—after his green card had been obtained but before the September 29, 2006 argument—identifying the need to discuss the "[n]ext steps on partnering agreement" as a topic for their next meeting, and to an email that Choo sent during the same period identifying as a meeting topic the "partnership agreement." Despite Malone's testimony that he had never agreed to be partners with Patel and Choo and that they "never discussed, you know, sharing equity after his green card prior to, you know, that September 29th blow-up"—Malone did not question these reference to the "partnership agreement" and in fact responded to Choo's email with,

"All good." We agree that the jury could have considered these emails and the parties' conduct as circumstances supporting the conclusion that the parties had an agreement.

**b. Documents reflecting Patel was an employee or reflecting that Malone was the owner of Prescendo do not conclusively disprove an agreement to be equal owners of Prescendo**

Malone alternatively argues that there is no evidence to support the jury's finding of an agreement to be equal partners because documentary evidence conclusively negates a partnership. Specifically, he points to the letter signed by Patel on December 15, 2003, in which he accepted an offer of at-will employment at a $24,000 salary with a potential "merit-based" bonus "dependent on Prescendo's overall company performance." Malone also points to Patel's INS papers and tax forms where he signed as an employee, and to a customer proposal drafted by Patel that referred to Malone as "Partner" and Choo as "Senior Business Analyst," with Choo commanding a lower hourly rate as evidence that "Malone was a partner and the owner of the business, whereas Patel was merely its at-will employee." Finally, Malone points to other papers, including an insurance application, application for a service mark, and a pleading in the MRE lawsuit in which Patel indicated that Malone was Prescendo's owner.

In response, Patel agrees that he and Choo were employees but asserts that "Malone cites no authority establishing that Patel's and Choo's status as employees negates the existence of the agreement to be equal partners." Patel also points out that Malone has not provided "any authority that establishes that an employee cannot own an interest in his employer's business." The at-will employment agree-

ment was consistent with Malone's representation that the "partnership could not be in writing" until the Patel's and Choo's green cards were received. Thus, Patel argues, the at-will agreements did not preclude Patel and Choo from performing the agreement and owning the equity when their green cards were received. Patel also points to evidence that Malone actually directed how the relationship was documented on the various papers, and that he trusted Malone's representation that the pending green card applications mandated that it be filled out that way.

Malone's argument is two-fold: (1) "proof of employment status necessarily makes partner status an impossibility," and (2) Patel's execution or acquiescence in the preparing of documents for various purposes indicating that Malone was the owner of Prescendo conclusively negates the existence of an agreement that Malone, Patel, and Choo were equal owners of Prescendo, despite other evidence of that intent. We disagree.

■ Malone has cited us no authority for the proposition that an at-will employee, as a matter of law, cannot ever own a partnership interest in his or her employer. An at-will employee can be, and often is, also an equity owner in his or her employer company. *E.g., Willis v. Bydalek,* 997 S.W.2d 798, 802–03 (Tex.App. Houston [1st Dist.] 1999, pet. denied) (holding minority shareholder who also managed business could be discharged by corporation at will absent an employee contract). While such a situation is more common with corporations, Malone has not proven that status as an employee and partner are mutually exclusive. *E.g., Woodruff v. Bryant,* 558 S.W.2d 535, 540–41 (Tex.Civ.App.-Corpus Christi 1977, writ ref'd n.r.e.) (recognizing that defendant began relationship as a manager of company, was later made one-fourth partner and

designated managing partner while "retain[ing] her employee status 'company manager,'" and still later "discontinued her status as an employee and as managing partner, [and] maintained her partner status as a silent partner"); *Strebel v. Wimberly,* 371 S.W.3d 267, 279 (Tex.App.-Houston [1st Dist.] 2012, no pet. h.) (recognizing that a person can serve both as an employee and limited partner of an entity); *Armstrong v. Phinney,* 394 F.2d 661, 664 (5th Cir.1968) (recognizing that, for income tax purposes, partner can "stand in any one of a number of relationships with his partnership, including those of creditor-debtor, vendor-vendee, and employee-employer.").

■ This Court has in fact resolved a partnership claim by an at-will W2 employee with reference to the TRPA factors, an analysis that is inconsistent with Malone's position. *Brown v. Swett & Crawford of Tex., Inc.,* 178 S.W.3d 373, 378–79 (Tex. App.-Houston [1st Dist.] 2005, no pet.) (affirming summary judgment in employer's favor because there was no evidence of an agreement to share profits, which the Court (relying on pre-*Ingram* cases) characterized as "an essential element of a partnership."). Because we reject the premise of Malone's argument—i.e. that an employer cannot agree to share a partnership interest with an at-will employee— we conclude that Patel's status as an at-will employee does not establish that there is legally insufficient evidence to support the jury's finding of an agreement.

We likewise reject Malone's argument that certain documents reflecting that he owned Prescendo, i.e., the application for insurance, the application for a service mark, an MRE litigation pleading, and a proposal prepared for a potential Prescendo client establish as a matter of law that there was no agreement between Malone, Patel, and Choo to be equal partners in

**680**

Prescendo. Certainly these were relevant to the jury's consideration, but the jury heard—and accepted—an explanation for why each of these documents said what it did.

Patel testified that Malone instructed him to designate Malone as the 100% owner on the insurance forms and service mark application. Malone told him that he needed to be reflected as the owner until they were able to document their partnership agreement in writing. The jury likewise saw and heard testimony about the MRE pleading. The pleading was filed in 2005, but the passage Malone points to is paraphrasing something that Malone told to MRE in 2003 before Patel or Choo had left MRE—i.e., Malone notified MRE's president "that he would be terminating his relationship with MRE at once and that he would be hiring Choo and Patel away from MRE to perform similar duties for a new business which would be owned by Malone." Given that this is not a representation by Patel, but only a recitation of his understanding of something Malone stated to a third party, and given the evidence that Patel and Choo were led by Malone to believe that there was a legal impediment to documenting their agreement in writings, this pleading does not negate as a matter of law the jury's finding of an agreement to be equal partners. Finally, Malone points to Patel's preparation of a business proposal for a potential client that labeled Malone as "Partner" and Choo as "Senior Business Analyst." The jury heard evidence that these designations do not have to do with ownership structure but, rather, the level of service being offered the client:

> Q. Are there titles or labels associated with those positions in the consulting industry?
>
> A. Meaning at the client site, if you're trying to do that kind of work?

> Q. So if you're going to try to get work—let me back up. What would be a designation or title for a junior consultant?
>
> A. It will probably be business analyst.
>
> Q. And what was the next level up from that?
>
> A. So we had business analyst, technical analyst. We would have junior business analyst, senior business analyst. Again, not much difference but it's just business analyst. And then there would be high-level advisory work, which is not where most of the work was at the clients; but sometimes clients like to put in folks for just a small number of hours doing some high-level advisory stuff. That would be called partner level work.
>
> Q. Okay. Now, you just used the word "partner." And here we've used the word "partner." Is the phrases used in the analyst world, does that denote the inner workings of whatever business you're coming from?
>
> A. Absolutely not. They're two completely separate things.

By way of example, Patel testified that while he was an owner of Glenrisk at the time of trial, he is designated "business analyst" on Shell's project—not "partner." The paperwork Patel prepared for customers does not negate the existence of an agreement to be equal partners.

Malone's insistence that the jury could not conclude that there was an agreement in the face of this documentary evidence is inconsistent with Texas law and the jury charge in this case, which permitted the jury to "consider what [the parties] said and did in light of the surrounding circumstances" in determining intent. *Cf. King v. Evans,* 791 S.W.2d 531, 533–34 (Tex. App.-San Antonio, 1990, writ denied) (affirming judgment on jury verdict deter-

mining that partner was entitled to interest in land even though title to land was recorded as jointly owned by another partner (individually) and by a nonpartner, and explaining that the "fact that the deed the land was taken in appellants' names is not conclusive in determining whether the land was a partnership asset" because ultimately whether "property used in the partnership operation is owned by the partnership is a question of intention"). Malone would have us look only at the documents without reference to the other evidence the jury heard about the parties' express agreement, about Patel's and Choo's trust in Malone (who directed how the relationship was documented), and about Patel's and Choo's belief that written documents could not reflect their agreement to be equal owners until their received their green cards. Because a reasonable and fair-minded jury could have found the parties' agreement to be equal partners based all the evidence in this case, its verdict is supported by legally sufficient evidence.

#### 4. There is factually sufficient evidence to support the jury's finding of agreement.

Malone asserts alternatively that the evidence is factually insufficient to support the jury's finding of agreement. He "acknowledge[s] that Patel and Choo used the word 'partner' or 'partnership' during the trial," but asserts that "their mere references to partnership deserve no credit because the law looks at substance and not at form." If, however, the Court "somehow disagrees and sees enough evidence to beat a no-evidence challenge," he urges us to "at least find the evidence factually insufficient."

The jury in this case was presented with two diametrically opposed fact scenarios—Patel claims Malone agreed they would be equal partners and Malone asserts that there was no such agreement. We have already concluded that some evidence supports the jury's finding of an agreement, and that none of the evidence Malone points to disproves an agreement as a matter of law. Assessment of the witnesses' credibility was in the province of the jury and we cannot disturb its determinations in that regard. *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761. The evidence supporting the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Cain*, 709 S.W.2d at 176. The evidence is thus factually sufficient.

We overrule Malone's first issue.

### QUASI–ESTOPPEL

Malone argues, for many of the same reasons he contended that the evidence was legally insufficient, that "Patel should be held to his documents, for reasons of quasi-estoppel." Malone requests that we reverse and render judgment in his favor based on the doctrine of quasi-estoppel because "it is intolerable for [Patel] to claim partnership status now, given his string of representations to the contrary."

In response, Patel points out that quasi-estoppel is an affirmative defense and Malone thus had the burden to plead, prove, and obtain a jury finding on this theory. According to Patel, because Malone "never raised quasi-estoppel during trial" and "did not obtain a finding on quasi-estoppel," he "cannot raise quasi-estoppel now." Finally, Patel argues that the evidence does not conclusively establish that quasi-estoppel applies because "Malone has not shown that being an employee is the acceptance of a benefit inconsistent with later becoming a partner based on an agreement that existed prior to the employment relationship."

"Quasi-estoppel precludes a party from asserting, to another's disad-

vantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex.2000). "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Id.* "Thus, quasi-estoppel forbids a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 87 (Tex. App.-Houston [1st Dist.] 2004, no pet.). "[T]here can be no estoppel from acceptance of benefits by a person who did not have knowledge of all material facts." *Lindley v. McKnight*, 349 S.W.3d 113, 133 (Tex.App.-Fort Worth 2011, no pet.) (citing *Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex.1971)).

This equitable doctrine operates as an affirmative defense. *Hamilton v. Morris Res., Ltd.*, 225 S.W.3d 336, 346 (Tex.App.-San Antonio 2007, pet. denied). Malone did not request that this issue be submitted to the jury, and the jury did not make any findings on this issue. Moreover, the evidence does not demonstrate that the doctrine of quasi-estoppel bars Patel's recovery as a matter of law. *Fasken Land & Minerals, Ltd. v. Occidental Permian Ltd.*, 225 S.W.3d 577, 594 (Tex. App.-El Paso, 2005, pet. denied). We have already rejected the argument that Patel status as an employee conclusively defeats any claim that the parties agreed to be partners. As for the other documents cited by Malone, the jury heard evidence that (1) Patel trusted Malone, (2) Malone was in charge of the business and accounting functions at Prescendo, (3) Malone represented to Patel that their agreement to be partners could not be writing until Patel received his green card, and (4) that Ma-

lone told Patel to fill out documents reflecting that Malone owned Prescendo until their agreement could be reduced to writing. In light of this evidence, as well as the evidence that Patel forewent other employment and accepted less compensation at Prescendo based on the parties' agreement, we cannot conclude, as a matter of law, that Patel accepted a benefit from being designated as an employee that is inconsistent with his agreement with Malone such that it would be unconscionable to enforce their agreement. Malone's position is in fact inconsistent with the evidence that Patel accepted *reduced* benefits as an employee precisely because of the additional benefits he expected from the partnership.

We overrule Malone's second issue.

## ORAL PROMISE

In his third issue, Malone challenges what he characterizes as Patel's "fallback theory" and argues that the evidence is "legally and factually insufficient to prove Patel's case for breach of an oral promise that he and Malone would become partners in the future." Malone asserts that "[a]ssuming for the sake of argument that Patel and Malone did in fact agree to be equal 'partners' as understood in the law[,] Patel still loses because he cannot show causation of any damages." Rather, according to Malone, "he caused his own predicament through his own deliberate choices."

Malone begins by noting that any partnership was "at-will." Then he asserts that even if they agreed to be partners in October 2003, Patel signing a letter accepting at-will employment with Prescendo on December 15, 2003 evidenced his "walking away from any embryonic partnership and soldier[ing] on as an at-will employee instead of as a partner." Thus, according to Malone, Patel cannot recover any damages

because no profits were generated during the time the at-will partnership lasted from October 2003 when the agreement was made until December 15, 2003 when Patel signed the letter. Malone argues that, on December 15, 2003, Patel made the conscious choice to terminate the at-will partnership and enter into an at-will employment relationship instead that turned out to be a bad deal for him. The fact that "ended up putting less money in his pocket during 2004–06 as an employee than he would have taken home as a partner, that did not result from anything Malone did." Rather, it "resulted from Patel's decision to go forward as an employee instead of as a partner."

Patel responds that "Malone never raised at-will partnership" and that there was never any evidence, as Malone now contends, that "the deal changed from a partnership to a strict employer employee relationship." We agree with Patel. The jury was presented with Patel's theory that Malone, Patel, and Choo agreed to be equal partners from the beginning. Patel testified that by signing the letter accepting at-will employment for $24,000, he was not intending to repudiate his agreement with Malone. Rather, Malone represented that letter was necessary paperwork and that their partnership could not be documented in writing until his green card was received. Patel also maintains the position that his status as an at-will employee does not negate an agreement for him to own equity.

Malone's theory on the other hand was that he never agreed to be partners and that Patel's signing the letter accepting at-will employment was evidence that there was never an agreement to be partners, *not* that it was evidence that Patel walked away from a partnership agreement. In any event, we have already concluded that Patel's status as an employee of Prescendo does not foreclose the jury's finding that an agreement existed with Malone for Patel to be an equal partner. For the same reasons, the letter does not demonstrate that Patel changed his mind and terminated his partnership agreement with Malone upon its signing.

We overrule Malone's third issue.

## CONCLUSION

Because we have overruled Malone's issues on appeal, we need not reach Patel's cross-appeal. We affirm the trial court's judgment.